675 S.E.2d 746

**Iraj MAZLOOM, Respondent,**

v.

**Manoochehr MAZLOOM, Albolfazl Mazloom and AMA, LLC, Appellants.**

**No. 4493.**

Court of Appeals of South Carolina.

Heard Dec. 2, 2008.

Decided Jan. 28, 2009.

Rehearing Denied May 5, 2009.

310.

312

Deborah Harrison Sheffield and Paul L. Reeves, both of Columbia, for Appellants.

Tobias G. Ward, Jr. and J. Derrick Jackson, both of Columbia, for Respondent.

WILLIAMS, J.:

Manoochehr Mazloom (Manooch) and Albolfazl Mazloom (Aboli) appeal the Master–in–Equity's finding that Iraj Mazloom (Iraj) owned a 25% interest in AMA, LLC (AMA). Manooch and Aboli also appeal the actual and punitive damages awarded to Iraj. We affirm as modified.

## FACTS/PROCEDURAL HISTORY

In January 1983, four of the Mazloom brothers, Iraj, Ahmad, Manooch, and Aboli, incorporated a business known as AMBI, Inc. (AMBI). AMBI owned certain real property in Richland County on which the four brothers operated a Mini Mart, an ABC liquor store, and a one-bedroom apartment. The four brothers were equal shareholders in AMBI, each

holding a 25% interest, although no stock certificates were ever delivered. Ahmad was named president of the corporation, and Iraj was named Secretary–Treasurer.[1]

Iraj worked as an employee of AMBI from 1980 until 1996. In October 1996, Ahmad sent a letter to Iraj informing him of an upcoming corporate meeting. During the meeting, a majority of the shareholders voted to remove Iraj from his position as Secretary–Treasurer of AMBI. His employment was also terminated immediately. Iraj was thereafter excluded from participating in the business.

On July 13, 2000, Articles of Dissolution were filed for AMBI. Iraj did not know about or participate in the vote for dissolution, and only the names of Ahmad, Manooch, and Aboli appeared on the papers as directors and officers of AMBI. On this same day, Ahmad, Manooch, and Aboli filed Articles of Organization for AMA. AMBI's real estate was eventually transferred to AMA for the sum of five dollars. Iraj, likewise, did not know about or participate in this transfer.

In September 2002, Iraj contacted an attorney, Franchot Brown (Brown), to help him clarify his interest in AMA. Brown prepared Articles of Amendment for AMA, which were signed by Manooch and Aboli and filed with the Secretary of State in November 2002.[2] The Articles of Amendment stated that upon AMBI's dissolution, AMA received all of AMBI's assets and good will and that AMBI shareholders were to retain their respective shares of stock in AMA as they had in AMBI. The Articles went on to state:

> That in the organization of AMA, LLC through inadvertence or mistake, Iraj Mazloom was not transferred over as a shareholder of stock from AMBI, Inc. to AMA, LLC which would have been correct, proper and was the intent of the original shareholders.

> That this amendment is to correct this error and respectfully acknowledge that Iraj Mazloom owns 25% (or 1/4) shares

---

1. It is unclear exactly what position Iraj held. While Iraj is named Secretary on many of AMBI's documents, a corporate letter from 1996 states Iraj's position was Secretary–Treasurer. This distinction, however, does not change our analysis.

2. Manooch and Aboli signed the Articles of Amendment twice because the first draft was defective in form.

of stock in AMA, LLC. That Iraj Mazloom shall be acknowledged by [AMA] as a 25% holder of shares in [AMA] and that this amendment shall be filed with the South Carolina Secretary of State as evidence that Iraj Mazloom ... owns 25% of all shares issued by AMA, LLC.

In January 2003, after the Articles of Amendment were filed, Ahmad sold his interest in AMA to Manooch and Aboli for $120,000. The bill of sale stated Ahmad held a 1/3 interest in AMA while Manooch and Aboli owned equal parts of the remaining 2/3 interest. Iraj was not given notice of this sale or an opportunity to participate and purchase any of Ahmad's interest.

In May 2003, Manooch and Aboli, on behalf of AMA, entered into a contract with Ganesh Mini Mart, LLC (Ganesh) to sell all of AMA's assets, including the Mini Mart, the ABC liquor store, and the one-bedroom apartment, as well as any inventory, furniture, fixtures, and equipment located therein. The purchase price was $345,000. Again, Iraj did not know about or participate in this transfer, and he did not receive any share of the sale proceeds.

Iraj originally filed a summons and complaint against Manooch and Aboli (hereinafter collectively referred to as "the brothers") in July 2004. The complaint was subsequently amended and filed in August 2005, asserting claims for an accounting, judicial dissolution or repurchase due to oppression, breach of fiduciary duty of care and loyalty, and breach of good faith and fair dealing. The brothers answered the complaint with defenses and counterclaims. As part of their defense of equitable estoppel, the brothers alleged that at the time AMBI transferred its assets to AMA, Iraj did not have any shares in AMBI because he had assigned his shares and interest to a third party nearly twenty years prior.

The matter was referred to the Master–in–Equity in January 2006 and came to trial in September of that year. The master found Iraj owned a 25% interest in AMA and awarded him $91,031.28 from the sale of AMA's assets and $70,200.75 from unpaid cash distributions. Additionally, the master awarded Iraj punitive damages of $25,000 against each brother, for a total of $50,000. A motion to alter, amend, and

reconsider was filed by the brothers, but the master denied the motion. This appeal follows.

## STANDARD OF REVIEW

"When legal and equitable actions are maintained in one suit, each retains its own identity as legal or equitable for purposes of the applicable standard of review on appeal." *Corley v. Ott*, 326 S.C. 89, 92 n. 1, 485 S.E.2d 97, 99 n. 1 (1997). The reviewing court should "view the actions separately for the purpose of determining the appropriate standard of review." *Jordan v. Holt*, 362 S.C. 201, 205, 608 S.E.2d 129, 131 (2005). In an action in equity, tried by the judge alone, without a reference, the appellate court has jurisdiction to find facts in accordance with its view of the preponderance of the evidence. *Townes Assocs., Ltd. v. City of Greenville*, 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976). On the other hand, when reviewing an action at law, on appeal of a case tried without a jury, the appellate court's jurisdiction is limited to correction of errors at law, and the appellate court will not disturb the judge's findings of fact as long as they are reasonably supported by the evidence. *Epworth Children's Home v. Beasley*, 365 S.C. 157, 164, 616 S.E.2d 710, 714 (2005).

## LAW/ANALYSIS

### I. Actions for Corporate Dissolution and an Accounting

The brothers first argue the master erred in finding Iraj held a 25% ownership interest in AMA. Specifically, the brothers argue all the probative evidence of record establishes Iraj transferred his 25% interest in AMBI to Shahin Mazloom (Niece), a niece of Iraj, Ahmad, Manooch, and Aboli, in 1985, and therefore, he had no claim to any ownership interest in AMA, the successor in interest to AMBI. We disagree, finding the preponderance of the evidence demonstrates Iraj retained his 25% ownership interest in AMBI.

An action for corporate dissolution is an action in equity, as is an action for an accounting. *Keane v. Lowcountry Pediatrics, P.A.*, 372 S.C. 136, 142, 641 S.E.2d 53, 57 (Ct.App.2007); *see Lee v. Lee*, 251 S.C. 533, 535, 164 S.E.2d 308, 308–09 (1968) (holding an action for an accounting is

equitable). This Court may, therefore, find facts in accordance with its own view of the preponderance of the evidence. *Keane,* 372 S.C. at 143, 641 S.E.2d at 57. We need not, however, "disregard the findings of the master who saw and heard the witnesses and was in a better position to evaluate their credibility." *Peoples Fed. Sav. & Loan Ass'n v. Myrtle Beach Golf & Yacht Club,* 310 S.C. 132, 140, 425 S.E.2d 764, 769 (Ct.App.1992).

It is undisputed that when AMBI was incorporated, Iraj held a 25% ownership interest in the corporation. The brothers alleged, however, that in October 1985, Iraj conveyed his interest in AMBI to Niece in order to protect his interests prior to his upcoming marriage. The brothers claimed Niece later transferred this interest to Aboli. While Iraj acknowledged that his intention at the time was to transfer his interest to Niece,[3] he testified that he did not believe he ever signed the papers to make that transfer.

No document purporting to transfer any ownership interest was entered into evidence with Iraj's signature on it. In fact, the only document involving Niece transferring an interest in AMBI states, "[Niece] ... conveys, transfers, and assigns unto [Aboli] any and all of the interest [Niece] previously acquired from [Aboli] in AMBI...." Moreover, AMBI's tax returns continued to list Iraj as late as 1997.

Additionally, in October 1996, Iraj received a letter from Ahmad informing him a corporate meeting was being called. Following that meeting, Iraj received another letter confirming what had been decided at the meeting. The letter stated, "It was decided that [Iraj], by majority of the vote, should be and was removed from his position as Secretary–Treasurer of AMBI, Inc. It was also decided that his employment with AMBI, Inc., be terminated effective immediately."

While we acknowledge there is a conflict between the two parties' accounts as to whether Iraj actually transferred his

---

3. In lieu of a prenuptial agreement, Iraj testified that he planned to transfer "everything in [his] name" to members of his family. This included his interest in his mother's home and the surrounding land as well as his interest in AMBI. Iraj testified that while he did transfer his interest in the home and land, his attorney told him it was unnecessary to transfer his interest in the corporation, so those documents were never signed.

25% ownership interest in AMBI to Niece, we find the preponderance of the evidence demonstrates Iraj retained his interest in AMBI and, therefore, also held a 25% ownership interest in the successor business, AMA. As further support that Iraj held a 25% ownership interest in the business, in October 2002, the brothers signed a document recognizing Iraj's 25% ownership interest in AMA. The document, which was filed with the Secretary of State, acknowledged that Iraj always held a 25% ownership interest in AMA and that it was merely through inadvertence or mistake that Iraj was not transferred over as a shareholder of stock from AMBI to AMA. Although the document was titled "Amendments to the Articles of Organization for AMA, LLC," the document was merely a confirmation of Iraj's ownership interest.[4]

Further, we find the brothers are estopped from denying the facts set forth in the document. "The doctrine of estoppel applies if a person, by his actions, conduct, words, or silence which amounts to a representation, or a concealment of material facts, causes another to alter his position to his prejudice or injury." *Rushing v. McKinney*, 370 S.C. 280, 293, 633 S.E.2d 917, 924 (Ct.App.2006). As to the party being estopped, the essential elements are (1) conduct amounting to a false representation or concealment of material facts, or conduct calculated to convey the impression that the facts are different or inconsistent with those that the party subsequently attempts to assert; (2) intention or expectation that the conduct will be acted upon by the other party; and (3) knowledge, actual or constructive, of the real facts. *Brading v. County of Georgetown*, 327 S.C. 107, 114, 490 S.E.2d 4, 7 (1997). As to the party claiming estoppel, "the essential elements are (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question, (2) reliance upon the conduct of the party estopped, and (3) prejudicial change in position." *Id.* at 114, 490 S.E.2d at 7–8.

These elements have been met in the present case. By signing the document, the brothers represented to Iraj that he

---

4. We additionally note that it is a crime for a person to "sign[] a document he knows is false in any material respect ... with intent that the document be delivered to the Secretary of State for filing." S.C.Code Ann. § 33–1–290(a) (2006).

held an undisputed 25% ownership interest in AMA. The brothers made this representation with knowledge that Iraj would rely on it and, therefore; not seek the help of an attorney to secure his interest in the business. Iraj did in fact rely on this representation and took no further legal actions. Thus, the brothers are estopped to deny Iraj held a 25% ownership interest in AMA.

## II. Timeliness of the Actions

Finding Iraj owned a 25% interest in AMA, we must address the timeliness of this action. The brothers claim Iraj's actions for corporate dissolution and an accounting are barred as untimely by the equitable doctrine of laches. The brothers also argue the action for breach of fiduciary duty is untimely due to the statute of limitations. We disagree that the equitable actions are untimely, and we will address the timeliness of the legal action in a subsequent section.

■■■ This action involves both equitable and legal causes of action. As stated earlier, actions seeking corporate dissolution or an accounting are both actions in equity. *Keane*, 372 S.C. at 142, 641 S.E.2d at 57; see Lee, 251 S.C. at 535, 164 S.E.2d at 308–09 (holding an action for an accounting is equitable). "[The South Carolina Supreme Court] has held that the statute of limitations does not apply to actions in equity." *Dixon v. Dixon*, 362 S.C. 388, 400, 608 S.E.2d 849, 855 (2005). Equitable causes of action may be barred as untimely, however, by the doctrine of laches. *Chambers of S.C., Inc. v. County Council for Lee County*, 315 S.C. 418, 421, 434 S.E.2d 279, 280 (1993).

■■■ "Under the doctrine of laches, if a party, knowing his rights, does not seasonably assert them, but by unreasonable delay causes his adversary to incur expenses or to enter into obligations or otherwise detrimentally change his position, then equity will ordinarily refuse to enforce those rights." Id. "The party asserting laches has the burden of showing negligence, the opportunity to act sooner, and material prejudice." *Richey v. Dickinson*, 359 S.C. 609, 612, 598 S.E.2d 307, 309 (Ct.App.2004). This Court has wide discretion to determine what constitutes an unreasonable delay. *Chambers of S.C., Inc.*, 315 S.C. at 421, 434 S.E.2d at 280. However, "[d]elay

alone in the assertion of a right, without injury to the adversary, does not constitute laches." *Gibbs v. Kimbrell,* 311 S.C. 261, 269, 428 S.E.2d 725, 730 (Ct.App.1993).

As noted above, we find Iraj always held a 25% ownership interest in AMA. Thus, there was no need for him to bring an action against the brothers seeking an accounting or a corporate dissolution until all of the assets of AMA were transferred to a third party without his knowledge or consent, which occurred in May 2003. Iraj initially filed his claim in July 2004, and following further discovery, an amended complaint was filed in August 2005. While we do not find this time period demonstrates an unreasonable delay by Iraj, we further note the brothers have failed to demonstrate how they have been prejudiced by any delay on Iraj's behalf. Consequently, the doctrine of laches is inapplicable. We find the equitable actions seeking an accounting and dissolution were not barred by the doctrine of laches.

### III. Damages

#### a. Actual Damages

The brothers argue the master erred in its award of actual damages. Specifically, the brothers argue (1) the evidence does not support a finding that Iraj is entitled to $91,031.28 for his 25% interest in the proceeds of the sale of AMA; and (2) the evidence does not support an award of lost cash distributions to Iraj. We agree in part.

The master has considerable discretion regarding the amount of damages, both actual and punitive. *Collins Entm't Corp. v. Coats & Coats Rental Amusement,* 355 S.C. 125, 138, 584 S.E.2d 120, 127 (Ct.App.2003). If evidence in the record supports the award for actual damages, this Court will only review the award for errors of law. *Austin v. Specialty Transp. Servs., Inc.,* 358 S.C. 298, 310–11, 594 S.E.2d 867, 873 (Ct.App.2004).

A business should be valued at its fair market value as a going business. *Brandi v. Brandi,* 302 S.C. 353, 357, 396 S.E.2d 124, 126 (Ct.App.1990). "Determination of fair market value is a question of fact." *Payne v. Holiday Towers, Inc.,* 283 S.C. 210, 215, 321 S.E.2d 179, 182 (Ct.App.1984).

Each case must be decided on its own facts and circumstances; thus, the court is not restricted to one method of valuation. *Belk of Spartanburg, S.C., Inc. v. Thompson,* 337 S.C. 109, 116, 522 S.E.2d 357, 360 (Ct.App.1999).

■ Fair market value has been defined as "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's[ ]length transaction." Black's Law Dictionary 1256 (7th ed.2000); see *Hous. Auth. of Charleston v. Olasov,* 282 S.C. 603, 608, 320 S.E.2d 478, 481 (Ct.App.1984) ("Fair market value is the price which a willing buyer will pay a willing seller, neither being under compulsion to buy or sell...."); *Reid v. Reid,* 280 S.C. 367, 373, 312 S.E.2d 724, 727 (Ct.App.1984) (stating the generally accepted definition of fair market value is the amount a willing but not obligated buyer would pay to a willing but not obligated seller). As to a business interest, "[t]he fair market value ... can often be determined simply by examining its market price." *Estate of Godley v. C.I.R.,* 286 F.3d 210, 214 (4th Cir.2002). When a business does not have a ready market for its shares or a sale has yet to take place, courts will generally consider and weigh multiple factors such as "inventory, accounts payable and receivable, and other legitimate assets or liabilities." *Brandi,* 302 S.C. at 357, 396 S.E.2d at 126. In the current case, however, the business has already been sold in an arm's length transaction.

At trial, different values of AMA were presented. It was shown that the brothers purchased a 1/3 interest in AMA from Ahmad for $120,000. Prior to selling AMA's assets to Ganesh, the property was listed for $447,500. Ganesh later purchased the property for $345,000. From these various values, the master determined AMA's fair market value to be $396,250, which was the average between the listing price and the sale price. We find this valuation improper.

Wayne Corley, a certified public accountant, testified the sale of AMA to Ganesh appeared to be an arm's length transaction. Corley further stated $345,000 represented the fair market value of the business. Additionally, the master made no findings that the sale was not an arm's length transaction.

Finding the business was sold to a third party in an arm's length transaction, we find AMA's fair market value is reflected by the sales price, which was $345,000. *Cf. Rutledge v. St. Paul Fire & Marine Ins. Co.*, 286 S.C. 360, 368, 334 S.E.2d 131, 136 (Ct.App.1985) ("The price paid for property at an actual, voluntary, and *bona fide* sale thereof is presumptive evidence of the property's value.") (emphasis in original). Iraj's 25% interest, therefore, amounts to $86,250. This value, however, is subject to a deduction.

At trial, Iraj admitted to a deduction that should be taken from AMA's valuation because of a loan payoff. The master found the value of this loan to be $32,124.89. While the brothers argue their personal loans and contributions to AMA should also be deducted from the business' value, there was insubstantial evidence presented to support this claim. In fact, the master noted that there were no promissory notes, receipts, or cancelled checks showing loans by the brothers to AMA. Therefore, the master found the only deduction to be taken amounted to $32,124.89, of which $8,031.22 was allocated to Iraj for his 25% interest in the business. This deduction brings Iraj's interest to $78,218.78. Because we find only the master's valuation of AMA to be improper, we affirm the master's award of damages but modify the amount to reflect the fair market value of Iraj's ownership interest as $78,218.78.

Additionally, the brothers argue the evidence does not support the master's award of lost cash distributions. We disagree.

"Any distributions made by a limited liability company before its dissolution and winding up must be in equal shares." S.C.Code Ann. § 33–44–405(a) (2006). Further, a member who assents to an unlawful distribution will be held personally liable for the unlawful distribution. S.C.Code Ann. § 33–44–407(a) (2006).

At trial, William Rawl, a certified public accountant, testified that after reviewing AMA's tax returns he noticed substantial increases, ranging from $10,000 to $20,000, in inventory year after year. From this, he concluded AMA's sales were underreported while purchases were reported at full value, resulting in unreported sales of roughly $280,000. Rawl

supported this argument by comparing an independent inventory of AMA's assets as of September 30, 2002, with the inventory figure listed on AMA's tax return. The independent inventory showed assets worth $34,257, while the tax returns showed assets worth $225,268. Based on these two figures, Rawl calculated AMA's unreported sales to be $280,803. The master then found Iraj was entitled to 25% of these unreported sales, which amounted to $70,200.75.

 Additionally, Iraj testified it had been the business practice of AMBI for each shareholder to take approximately $180 per day from the business as "pick-up" money. To support the contention that this practice continued with AMA, Rawl examined AMA's sales and expense summaries from 2003. Rawl noted that while sales and purchases were similar to past years, in 2003 AMA had an increase of over $10,000 in cash deposits. Iraj stated this increase in cash was due to the brothers not taking their usual "pick-up" money from the business, because they were grooming the business for sale. Based on the foregoing, we find substantial evidence in the record supports an award for lost cash distributions and, thus, affirm the master's award.

### b. Punitive Damages

 The brothers also argue the master erred in awarding Iraj punitive damages based on the brothers' alleged breach of fiduciary duties. We disagree.

Initially, we must address the timeliness of this action. Iraj's claim for breach of fiduciary duty is subject to a three-year statute of limitations. S.C.Code Ann. § 15–3–530 (2005); S.C.Code Ann. § 33–44–410(b) (2006). The brothers sold AMA to a third party without Iraj's knowledge or consent in May 2003. Iraj then filed his initial complaint in July 2004 and his amended complaint in August 2005. Because the act of selling the business to a third party was the main basis for the master's finding of a breach of fiduciary duty, we find the claim was filed in a timely manner.

 An action for breach of fiduciary duty is an action at law. *Jordan*, 362 S.C. at 205, 608 S.E.2d at 131. Consequently, this Court must uphold the master's findings unless they are without evidentiary support. *Id.* An award of puni-

tive damages is left almost completely to the discretion of the jury and trial judge because the trial judge was able to hear all of the evidence and was more familiar with the evidentiary atmosphere at trial. *Id.* at 207, 608 S.E.2d at 132 (citations omitted). An award of punitive damages can serve two purposes: (1) punishing the wrongdoers and deterring them and others from engaging in similar reckless, willful, wanton, or malicious conduct; and (2) vindicating a private right of the injured party by requiring the wrongdoers to pay money to that party. *Clark v. Cantrell*, 339 S.C. 369, 378–79, 529 S.E.2d 528, 533 (2000).

▉▉▉▉▉ If punitive damages are awarded, the master should review the amount awarded by considering the factors set forth in *Gamble v. Stevenson*, 305 S.C. 104, 111–12, 406 S.E.2d 350, 354 (1991). These factors include the following:

(1) defendant's degree of culpability; (2) duration of the conduct; (3) defendant's awareness or concealment; (4) the existence of similar past conduct; (5) likelihood the award will deter the defendant or others from like conduct; (6) whether the award is reasonably related to the harm likely to result from such conduct; (7) defendant's ability to pay; and finally, (8) . . . other factors deemed appropriate.

*Id.* (internal quotations and citations omitted). The master's findings on these factors must be set forth in the record. *Id.* at 112, 406 S.E.2d at 354.

We find the master's award of punitive damages for breach of fiduciary duty is supported by the evidence in the record. The master found the misconduct of the brothers warranted an award of punitive damages to Iraj. This conduct included selling all of AMA's assets to a third party without Iraj's knowledge or consent, filing an official document stating Iraj held a 25% interest in AMA and then taking an opposite position after the business' assets were sold,[5] failing to hold the sales proceeds in trust and to provide Iraj with his share,

---

5. We additionally note a party may be personally liable for false statements made in filed records pursuant to S.C.Code Ann. § 33–44–209 (2006) which states: "If a record authorized . . . to be filed under this chapter contains a false statement, one who suffers loss by reliance on the statement may recover damages for the loss from a person who signed the record . . . and knew the statement to be false at the time the record was signed."

and filing Articles of Termination for AMA without Iraj's knowledge or consent.

Additionally, the master properly considered the *Gamble* factors when determining the appropriate amount to be awarded, and the master set forth the findings in the record. The master found the brothers were completely culpable for the misconduct leading to the award of punitive damages and that the brothers were fully aware of this misconduct which they engaged in repeatedly. The master also found the award was likely to deter the brothers from similar conduct in the future, the brothers had the ability to pay the award "based on their note with Ganesh and ownership interests in houses in Lexington County," and the award was reasonably related to the harm.

There is ample evidence in the record to support the master's findings. For example, Iraj testified he was not told about the sale of AMA's assets and was not given any of the proceeds. Iraj stated that after the sale he repeatedly asked the brothers to provide him with his 25% share which they had acknowledged he owned in the document signed and filed in November 2002, but the brothers refused to 'acknowledge his interest. Iraj also testified he was not consulted or included in the filing of the Articles of Termination for AMA.

We find the master's findings are supported by evidence in the record, and therefore, we find no abuse of discretion in the master's award of punitive damages.

In light of our decision on these issues, we need not address the remaining arguments on appeal. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (finding when a decision of one issue is dispositive, it is not necessary to decide remaining issues on appeal).

## CONCLUSION

Based on the foregoing, the master's order is **AFFIRMED AS MODIFIED.**

PIEPER and GEATHERS, JJ., concur.