**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

David O'Shields, Appellant,

v.

Piedmont Glass & Mirror Company, Inc., Julie Taylor, David Taylor, and Carolina Storefront Systems, Inc., Respondents.

Appellate Case No. 2020-000161

———

Appeal From Cherokee County
J. Mark Hayes, II, Circuit Court Judge

———

Unpublished Opinion No. 2023-UP-256
Heard June 7, 2023 – Filed June 28, 2023

———

**REVERSED AND REMANDED**

———

Chelsea R. Rikard, of A Business Law Firm, LLC, of Spartanburg, for Appellant.

Joseph L.V. Johnson, of Saint-Amand, Thompson & Mathis, LLC, of Gaffney, for Respondents.

———

**PER CURIAM:** In this action against Piedmont Glass & Mirror Co., Inc. (Piedmont), Julie Taylor, David Taylor, and Carolina Storefront Systems, Inc. (collectively, Respondents), David Lynn O'Shields (Lynn) appeals, arguing the

circuit court erred in (1) applying the Statute of Frauds to find he was not a partner or shareholder; (2) failing to find Respondents were equitably estopped from asserting the Statute of Frauds; (3) applying a statute of limitations; (4) failing to find he was oppressed as a shareholder; and (5) failing to find Carolina Storefront was a successor corporation of Piedmont.[1]  We reverse and remand.

**FACTS**

This case involves a dispute between Lynn, and his sister and her husband, Julie and David Taylor.  Lynn testified at a bench trial that in the early 1990s, he was working at Cone Mills Carlisle Finishing when Julie asked him to work for her at Piedmont.  According to Lynn, Julie told him that if he worked for her at a reduced salary for a year, he would be a 50% owner in Piedmont.  Lynn admitted the 1995 agreement he made with Julie was verbal.  Lynn's wife, Sarah, testified she was present when Julie asked Lynn, for the second or third time, to go into business with her for a 50% ownership share.  Lynn and Julie's brother, Mark, who also worked for Piedmont, testified Julie asked him into her office "to explain to [him] why [she] chose Lynn to be [her] business partner instead of [Mark]."  Mark testified Julie told him that her deal with Lynn was if he ran the commercial glass business for a year, he would be a 50% owner of the business.

Lynn testified he agreed to Julie's offer, and his income dropped from $34,000 per year at Cone Mills to approximately $11,000 per year at Piedmont.[2]  Lynn began working for Piedmont in mid-1995 and worked exclusively for Piedmont beginning in 1996.  Lynn claimed he contributed a truck and many tools for Piedmont's use at the job sites.

---

[1] Lynn alleged causes of action for the following: an accounting, conversion, ultra vires, conflict of interest transactions, breach of fiduciary duties, preference, judicial dissolution of corporation, civil conspiracy, negligent misrepresentation, violation of the South Carolina Unpaid Wages Act, violation of the South Carolina Workers' Compensation Act, negligence and gross negligence, negligent supervision, fraudulent transfer, and appointment of a court receiver.  In an earlier order, the circuit court denied Respondents' motion for summary judgment except for the dismissal and grant of summary judgment on Lynn's workers' compensation and wage claims.

[2] Lynn admitted he received some cash payments during this period that he did not report on his tax return; however, he did not recall any amounts.

The December 10, 1998, Minutes of Organizational Meeting of Shareholders lists Lynn, Julie, and David as being present at the meeting, the election of Julie as president and David as secretary, the unanimous approval of the adoption of a Shareholder Management Agreement, and the subscription of shares of stock as follows: 400 to Julie, 400 to Lynn, and 200 to David. The Minutes also provided that the shareholders approved a motion that the subscriptions for shares in the company were conditioned "upon payment." Lynn testified he attended the meeting and was named vice president.

Piedmont filed Articles of Incorporation on December 14, 1998, indicating the existence of the corporation as of January 1, 1999. David was listed as the registered agent. Lynn testified that although he was promised a 50% share in Piedmont, a "lending establishment wanted [the Taylors] to have controlling interest" in Piedmont, so the paperwork indicated Lynn owned 40%, Julie owned 40%, and David owned 20%. Lynn claimed the Taylors assured him that he still owned 50%, despite the paperwork. The South Carolina Department of Revenue (SCDOR) Business Tax Application, filed December 10, 1998, and signed by David as the "Sec/Treas," also indicated the 40/40/20 ownership percentages. In addition, all tax returns dated between 1999 and 2006 identified Lynn as a shareholder. Lynn also signed corporate documents dated January 22, 2001, and July 14, 2004, as the vice president. These and numerous other corporate documents indicate Lynn is a shareholder. A stock transfer ledger reflects transfers of 400 shares to Lynn, 400 shares to Julie, and 200 shares to David, all on January 1, 1999.[3]

In 2007, Lynn fell off a ladder while working for Piedmont and broke his right heel bone. He endured five surgeries before eventually having his foot amputated in 2013. At the time of the accident, Lynn's doctor recommended he not drive or return to work for six months. When he attempted to return to work after six months, Lynn was told he could work, but he would not be paid. Lynn filed a workers' compensation claim. After Lynn's accident and effective "firing," he was no longer provided notice of corporate meetings and was omitted as an owner from the corporate records and tax returns.

A March 10, 2008 corporate resolution noted a dispute about Lynn's ownership and stated "[a]ction [was] therefore taken by at minimum 60% of shareholders." A

---

[3] Julie testified the signatures on the Stock Transfer Ledger were not in her or David's handwriting. The ledger does not identify the names as signatures and appears more as a list.

similar notation is included in an April 1, 2008 corporate resolution. On September 10, 2009, David and Julie executed a corporate resolution to "cancel the stock subscription issued to" Lynn. On March 15, 2011, while this action was pending, David filed Articles of Incorporation for Carolina Storefront naming himself as the only owner. All shares were issued to David. On August 1, 2011, Julie and David executed a corporate resolution to approve the sale of Piedmont's real and personal property to Carolina Storefront. The Piedmont assets were sold to Carolina Storefront on October 31, 2011, for $5. Piedmont was dissolved on February 22, 2013.

Julie testified she worked for Piedmont in the early 1990s for the previous owner, Brian Currie. After a fire damaged the business, Julie purchased it from Currie. Currie's corporation was dissolved on April 14, 1995. Julie claimed she asked Lynn to work for her to grow the business. Soon thereafter, David also began working for her. According to Julie, Lynn quit in anger on multiple occasions. Julie testified that after Lynn's injury, Piedmont offered him the opportunity to work in-house, but Lynn refused and "said he had to do what his doctor told him to do . . . ." Julie admitted that during her deposition for the workers' compensation action she testified Lynn was a partner, stating then, "somebody in his position . . . shouldn't expect to be out of work for six months when there [were] plenty of things he could do there being a partner of the company," and "I would expect an adult who was a part owner of a company to have more interest in his company." Her deposition testimony also reflected her statement that she did not know how Lynn breached a duty to the corporation. Julie admitted Lynn brought tools to use at work, but claimed all employees were required to provide their own tools. Julie next admitted that in her deposition testimony, she confirmed the Business Tax Application identifying Lynn as 40% owner was accurate. She also admitted she signed the Shareholder Management Agreement that identified Lynn as a shareholder.

David, a CPA, testified he began helping at Piedmont while still employed at another job. He described his duties as "[taking] care of all accounting and computer systems." He claimed he invested approximately $42,000 into Piedmont; however, he admitted during cross-examination that the $42,000 was a loan despite being recorded on the financial statements as capital. David testified Piedmont purchased the building it was renting as indicated in the January 22, 2001, resolution. According to David, tax liens against Piedmont of approximately $500,000 led to the formation of Carolina Storefront. He testified that although Carolina Storefront bought Piedmont's assets for $5, it had to pay off Piedmont's

liens, including $60,000 to SCDOR, and $17,000 in other liens, to get a loan and mortgage.

Lynn testified he obtained a loan to finance the purchase of the building. He claimed that when Piedmont was incorporated, David and Julie represented to him that the bank required David to be an owner and Lynn had to pledge all of his personal assets, including his home, car, and jewelry, as collateral for the loan. Lynn testified he never had access to the corporate finances and David controlled the "financial ends of it," although Lynn was aware of issues with Piedmont's financial bookkeeping as early as 1999. Lynn also testified he suffered tremendous financial loss due to his purported ouster as a shareholder by Julie and David.

John Freeman testified as an expert in "the field of proper conduct by business managers in factual settings involving business governance decisions and stock issuance actions." Freeman concluded Lynn and Julie entered into a "handshake partnership," and that Lynn's "buy-in" was his sweat equity. Freeman based his findings on the unlikelihood of Lynn taking a lower-paying position absent any incentive and on Julie's admissions during the workers' compensation proceeding that Lynn was an owner in Piedmont. Freeman explained the partnership interest "morphed into" a corporate interest. He also considered Lynn's contribution of a truck and equipment to the company. He relied on the corporate documents reflecting Lynn as a shareholder and Lynn being required to guarantee a loan and pledge personal assets to secure the company's building. Freeman also relied on the SCDOR and IRS filings that listed Lynn as a 40% owner. According to Freeman, the original partnership agreement was not required to be in writing. Freeman also testified regarding stockholder oppression and successor corporations, concluding this was a classic case of a minority shareholder being frozen out of his shareholder interest, and Carolina Storefront was a "succession" company to Piedmont.

Geoffrey Handel, who was qualified as an expert in forensic accounting, tax preparation, and fraud examinations, testified Piedmont's corporate documents indicated there were three owners. Handel testified regarding Piedmont's inappropriate finances[4] and concluded the sale of Piedmont's building to Carolina Storefront was not an arms-length transaction.

---

[4] Handel testified there were many personal items paid for by the corporation throughout the years of Piedmont's existence.

By order filed June 4, 2019, the circuit court dismissed the case with prejudice based on the expiration of the statute of limitations and on the Statute of Frauds. In its order, the court initially found Lynn failed to prove he was a shareholder. The court next found the oral agreement, if it existed, could not be judicially enforced because the Shareholder Agreement provided that shares were conditioned "upon payment," and Lynn admitted he never paid for his shares. The court also noted Piedmont was incorporated in 1998 and Lynn did not file this action until 2007. It found Lynn was barred by the statute of limitations because although Lynn claimed a 50% ownership, he had reason to know the documents indicated he had a 40% ownership, and he took no action. The court stated all causes of action other than the negligent misrepresentation claim were dependent on Lynn's status as a shareholder, and Lynn could not meet every element of a negligent misrepresentation claim. The court found it was "wrong" of the defendants to have exposed Lynn to the debt liability and listed him on tax returns as a shareholder while claiming he was not a shareholder. The court stated, "Does a lack of sophistication justify the [Respondents'] conduct when the evidence more-likely-than-not establishes that all the parties felt that [Lynn] had a vested interest in the business? It does not." However, the court ultimately found Lynn did not present evidence of "specific damages or injury" and failed to meet his burden of proving any of his claims. Lynn moved for reconsideration, including requesting rulings on the issues of equitable estoppel, partial performance, oppression, and successor liability. The court denied the motion, finding that as to the issues not ruled upon, its findings that Lynn failed to prove he was a shareholder and the bar of the statute of limitations were dispositive. This appeal follows.

**STANDARD OF REVIEW**

Although Lynn alleged both legal and equitable claims, we find the crux of his complaint arises from his position as a shareholder in Piedmont. Thus, we review this as an action in equity. *See Straight v. Goss*, 383 S.C. 180, 191, 678 S.E.2d 443, 449 (Ct. App. 2009) ("[A]n action for stockholder oppression[] is one in equity."). "In actions in equity[,] . . . the appellate court may view the evidence to determine the facts in accordance with its own view of the preponderance of the evidence . . . ." *Florence Cnty. Sch. Dist. No. 2 v. Interkal, Inc.*, 348 S.C. 446, 450, 559 S.E.2d 866, 868 (Ct. App. 2002).

**LAW/ANALYSIS**

**A.      Shareholder Status, the Statute of Frauds, and Equitable Estoppel[5]**

Lynn initially argues the circuit court erred in finding he was not a shareholder. He also argues the court erred in finding even if an agreement existed for him to become a shareholder, the Statute of Frauds barred the agreement.  Lynn next argues the court erred in failing to find Respondents equitably estopped from raising the Statute of Frauds.[6]

We first find the circuit court erred in finding Lynn was not a shareholder in Piedmont.  Although the December 10, 1998 Minutes provided that subscriptions for shares in the company were conditioned "upon payment," it was clear that David also did not pay for his shares because he admitted during testimony that he considered his $42,000 payment to be a loan.  We find Respondents' failure to otherwise enforce the agreement prevents them from enforcing it against Lynn.

> Participants in close corporations and similar businesses often fail to observe corporate formalities or specific terms of shareholders' agreements.  The close relationships among the parties sometimes lead them to depart from formalities that they have written down in the past and that informality can sometimes create problems in the use of share transfer restrictions and buyout agreements. . . .  At a later point when harmony among the participants disappears and one side seeks to enforce the provisions of a restriction, the earlier informality may become an issue.
>
> Courts sometimes have found that prior inconsistent conduct causes the agreement to no longer be enforceable, as where transfers have been permitted and considerable time has passed.
>
> * * *
>
> Failure to trigger the procedures specified in the agreement can lead to loss of that right . . . .

---

[5] We combine Lynn's first and second arguments.

[6] Lynn also argues the doctrine of partial performance entitled him to relief.

1 F. Hodge O'Neal, Robert B. Thompson & Harwell Wells, *O'Neal and Thompson's Close Corporations and LLCs: Law and Practice* § 7:15 (3d ed. 2022). All of the documentary evidence indicates Lynn was a shareholder. In addition, Julie referenced Lynn's status as an owner and/or partner in her deposition testimony for the workers' compensation action. Even the circuit court found "the evidence more-likely-than-not establishes that all the parties felt that [Lynn] had a vested interest in the business." Based on our own view of the preponderance of the evidence, we find Lynn was a shareholder; thus, we reverse the circuit court on this issue.

We likewise reverse the circuit court on the issue of the Statute of Frauds because we find Respondents were equitably estopped from asserting the Statute of Frauds as a defense.[7] The Statute of Frauds provides that all agreements that cannot be performed within one year shall be in writing and signed by the party to be charged. S.C. Code Ann. § 32-3-10(5) (2007). In *Springob*, our supreme court remanded the issue of whether the doctrine of equitable estoppel applied to prevent the University from asserting the Statute of Frauds to avoid a contract between the University and members of the University of South Carolina Gamecock Club. 407 S.C. at 497–98, 757 S.E.2d at 387–88. The court stated the following:

> "[T]he doctrine of estoppel may be invoked to prevent a party from asserting the statute of frauds." *Collins Music Co. v. Cook*, 281 S.C. 580, 583, 316 S.E.2d 418, 420 (Ct. App. 1984) (citing *Florence Printing Co. v. Parnell*, 178 S.C. 119, 127, 182 S.E. 313, 316 (1935)). The party asserting estoppel "must show that he has suffered a definite, substantial, detrimental change of position in

---

[7] Because we find equitable estoppel bars the application of the Statute of Frauds here, we need not reach whether the contract could be completed within one year or whether the equitable doctrine of partial performance applies. *See Springob v. Univ. of S.C.*, 407 S.C. 490, 495–96, 757 S.E.2d 384, 387 (2014) ("If there is a possibility that a contract might be performed within one year, the statute of frauds is not a bar to enforcement of the contract."); *Coker v. Richtex Corp.*, 261 S.C. 402, 406, 200 S.E.2d 231, 232 (1973) ("Our courts have long recognized the majority rule that full performance by one side will take the entire contract out of the one year clause of the statute of frauds."); *Stackhouse v. Cook*, 271 S.C. 518, 521, 248 S.E.2d 482, 483 (1978) (stating "sufficient part performance of a parol contract for the conveyance of land will remove the contract from the statute of frauds").

reliance on the contract, and that no remedy except enforcement of the bargain is adequate to restore his former position." *Id.* "It is not sufficient to show merely that he has lost an expected benefit under the contract." *Id.*

*Springob*, 407 S.C. at 497, 757 S.E.2d at 387–88.

To invoke the doctrine of equitable estoppel to prevent the application of the statute of frauds, there must be competent proof of the existence of the oral contract. *Atl. Wholesale Co. v. Solondz*, 283 S.C. 36, 40, 320 S.E.2d 720, 723 (Ct. App. 1984) (quotations and citations omitted). Lynn testified to the existence of the agreement and provided evidence from Sarah and Mark in support thereof. There was evidence Lynn voluntarily reduced his salary to work for Piedmont and expert evidence that a person is unlikely to do so absent a compelling reason. Although Respondents presented contrary evidence, in our own view of the preponderance of the evidence, we find it insufficient to dispute Lynn's claim of the existence of the oral contract. *See U.S. Bank Tr. Nat. Ass'n v. Bell*, 385 S.C. 364, 375, 684 S.E.2d 199, 205 (Ct. App. 2009) (applying the appellate court's own view of the preponderance of the evidence in an equitable action).

In *Strickland v. Strickland*, our supreme court explained that "[t]he essential elements of equitable estoppel are divided between the estopped party and the party claiming estoppel." 375 S.C. 76, 84, 650 S.E.2d 465, 470 (2007). The court continued:

> The elements of equitable estoppel as related to the party being estopped are: (1) conduct which amounts to a false representation, or conduct which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention that such conduct shall be acted upon by the other party; and (3) actual or constructive knowledge of the real facts. The party asserting estoppel must show: (1) lack of knowledge, and the means of knowledge, of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change of position in reliance on the conduct of the party being estopped.

*Id.* at 84–85, 650 S.E.2d at 470. As to Respondents, we find the elements are met. There is evidence Julie offered Lynn a 50% share in Piedmont if he came to work for it for one year. However, she subsequently contended she merely hired him as an employee. Julie knew Lynn was leaving a job for a reduced salary to work for her, which she intended and expected of him. Yet according to her, she never intended to make or consider Lynn a partner or shareholder. As to Lynn, we likewise find the elements are met. Lynn testified he left his job to work for Piedmont, was required to pledge personal assets, and brought his truck and tools to Piedmont. We find these acts meet all three of the elements for the party asserting estoppel. *See State v. Hinojos*, 393 S.C. 517, 523, 713 S.E.2d 351, 354 (Ct. App. 2011) ("In order to overcome statutory requirements that an agreement be in writing, the party asserting estoppel must show that he suffered a definite, substantial, detrimental change of position in reliance on such agreement and that no remedy except enforcement of the bargain is adequate to restore his former position." (quoting *Player v. Chandler*, 299 S.C. 101, 106, 382 S.E.2d 891, 894 (1989))); *Mazloom v. Mazloom*, 382 S.C. 307, 318–19, 675 S.E.2d 746, 752 (Ct. App. 2009) (finding estoppel applied to brothers who challenged the plaintiff's ownership in a corporation where the brothers signed documents representing the plaintiff held a 25% ownership in a corporation with knowledge the plaintiff would rely on it and the plaintiff did rely on it), *aff'd*, 392 S.C. 403, 709 S.E.2d 661 (2011).

## B.    Statute of Limitations

Lynn argues the circuit court erred in finding his action barred by the statute of limitations. We agree.

Both parties argue this action is governed by the three-year statute of limitations dictated by section 15-3-530 (2005) of the South Carolina Code. Respondents additionally argue it is governed by the three-year statute of limitations in the South Carolina Business Corporation Act.[8] The discovery rule applies under either statute of limitations. *See Rumpf v. Mass. Mut. Life Ins. Co.*, 357 S.C. 386, 394, 593 S.E.2d 183, 187 (Ct. App. 2004) ("In determining when a cause of action arose under section 15-3-530, we apply the 'discovery rule.'"); § 33-8-420(e) (explaining an action under this section must be commenced "within three years after the cause of action has accrued, or within two years after the time when the cause of action is discovered, or should reasonably have been discovered, whichever sooner occurs" unless the "breaches of duty . . . have been concealed fraudulently").

---

[8] S.C. Code Ann. § 33-8-420(e) (2006).

In *Dean v. Ruscon Corp.*, our supreme court explained the discovery rule:

> According to the discovery rule, the statute of limitations begins to run when a cause of action reasonably ought to have been discovered. The statute runs from the date the injured party either knows or should have known by the exercise of reasonable diligence that a cause of action arises from the wrongful conduct. We have interpreted the "exercise of reasonable diligence" to mean that the injured party must act with some promptness where the facts and circumstances of an injury place a reasonable person of common knowledge and experience on *notice* that a claim against another party might exist. Moreover, the fact that the injured party may not comprehend the full extent of the damage is immaterial.

321 S.C. 360, 363–64, 468 S.E.2d 645, 647 (1996) (internal citations omitted). "[T]he discovery rule exists to avoid the harsh and unjust result of closing the courtroom doors to a plaintiff whose 'blameless ignorance' resulted in a failure to pursue a cause of action within the limitations period." *Moriarty v. Garden Sanctuary Church of God*, 341 S.C. 320, 333, 534 S.E.2d 672, 678–79 (2000), *holding modified on other grounds by State v. Cherry*, 361 S.C. 588, 606 S.E.2d 475 (2004). Although a statute of limitations "is intended to run against those who are neglectful of their rights and who fail to exercise reasonable diligence in enforcing their rights[,] . . . it is not the policy of the law to unjustly deprive an injured person of a remedy." *Id.* at 333, 534 S.E.2d at 679. Conflicting evidence as to the application of the discovery rule and the date a statute of limitations began to run present questions of fact. *Allwin v. Russ Cooper Assocs.*, 426 S.C. 1, 13, 825 S.E.2d 707, 713 (Ct. App. 2019).

Respondents argue because Lynn knew as early as December 1998—by executing documents stating he owned 40% of the company— he was not a 50% owner, his action was filed well beyond the expiration of the statute of limitations. Lynn argues the circuit court erred in likewise finding him barred because he claimed a 50% rather than 40% share in Piedmont. Lynn argues the appropriate inquiry for determining when the statute of limitations begins to run is when Lynn knew or had reason to know that Respondents were denying he was an owner at all.

Lynn testified Respondents told him the reason the documentary evidence indicated he only owned 40% of Piedmont was due to a requirement by the corporation's lenders. At trial, Respondents presented no evidence to explain the documents reflecting Lynn's 40% ownership rather than 50% because they denied Lynn owned any of Piedmont. Lynn did not have actual notice of Respondents' position until he returned to work after his injury in 2007, and he filed this action in 2007.[9] Under our own view of the preponderance of the evidence, we find the statute of limitations began to run when Lynn was told he could not return to work for Piedmont for pay. *See* § 15-3-530(9) (explaining the three-year statute of limitations in "an action against directors or stockholders . . . to recover a penalty or forfeiture imposed or to enforce a liability created by law . . . [is] not considered to have accrued until the discovery by the aggrieved party of the facts upon which the penalty or forfeiture attached or the liability was created").

### C.   Oppression and Successor Corporation

Lynn argues the circuit court erred in failing to find he was oppressed as a shareholder and in failing to find Carolina Storefront was a successor corporation of Piedmont. In the court's order denying Lynn's motion for reconsideration, it declined to rule on shareholder oppression and successor liability given its ruling that Lynn was not a shareholder. Because we reverse the circuit court's findings on Lynn's status as a shareholder and on the issues of the Statute of Frauds and the statute of limitations, we remand the issues of oppression and successor corporation.

### CONCLUSION

We reverse the circuit court as to its findings on Lynn's status as a shareholder. We also reverse the circuit court's order finding that Lynn was barred by the Statute of Frauds because we find equitable estoppel applied. We likewise reverse the circuit court's finding that Lynn was barred by the statute of limitations. We remand the issues of shareholder oppression and successor corporation.

**REVERSED and REMANDED.**

---

[9] We note that even the circuit court recognized Respondents' "act of denying [Lynn's] injury claim and then firing [him] when he refused to do office or customer[ ]service work during his period of work restriction was the original domino that set off the events that have led to the present litigation . . . ."

**THOMAS, MCDONALD, and HEWITT, JJ., concur.**