691 S.E.2d 135

**Donald C. AUSTIN, Respondent/Appellant,**

v.

**STOKES–CRAVEN HOLDING CORP., d/b/a Stokes Craven Ford, Appellant/Respondent.**

**No. 26784.**

Supreme Court of South Carolina.

Heard June 11, 2009.

Decided March 8, 2010.

Rehearing Denied April 21, 2010.

24

28

30

Scott L. Robinson, of Johnson & Robinson, of Manning, Stephen L. Brown, Russell G. Hines and Edward D. Buckley, all of Young, Clement Rivers, of Charleston, for appellant-respondent.

C. Steven Moskos, of Charleston, and Brooks R. Fudenberg, of Mt. Pleasant, for respondent-appellant.

Justice BEATTY.

Donald C. Austin (Austin) filed suit against Stokes–Craven Holding Corporation d/b/a Stokes–Craven Ford (Stokes–Craven), an automobile dealership, after he experienced problems with his used vehicle and discovered the vehicle had sustained extensive damage prior to the sale. A jury found in favor of Austin and awarded him $26,371.10 in actual damages and $216,600 in punitive damages.

Stokes–Craven challenges the verdict alleging the trial judge committed several errors which warrant a new trial. In his appeal, Austin contends the trial judge erred in requiring him to elect between his verdict for common law fraud and the violation of the South Carolina Dealer's Act.[1] Additionally, Austin claims the trial judge erred in declining to award him prejudgment interest. This Court certified this case from the Court of Appeals pursuant to Rule 204(b), SCACR. We affirm

---

1. The South Carolina Regulation of Manufacturers, Distributors, and Dealers Act (the "Dealer's Act") is codified at S.C.Code Ann. §§ 56–15–10 to –600 (2006 & Supp.2009). Section 56–15–40 provides in relevant part, "It shall be deemed a violation of paragraph (a) of § 56–15–30 for any manufacturer ... distributor, wholesaler ... or motor vehicle dealer to engage in any action which is arbitrary, in bad faith, or unconscionable and which causes damage to any of the parties or to the public." S.C.Code Ann. § 56–15–40(1) (2006).

in part, reverse in part, and remand for entry of judgment consistent with our decision.

## FACTUAL/PROCEDURAL HISTORY

On December 1, 1999, Gary Bailey purchased for $32,000 a 2000 Ford F–250 Super Duty Lariat 4X4, extended cab, eight-cylinder, turbo-diesel truck from Stokes–Craven, a Manning automobile dealership. Because Bailey maintained a business relationship with Kenny Craven (Kenny), the brother and employee of one of the owners of Stokes–Craven, Bailey dealt solely with him.

After the purchase, Bailey and his son, Kerry, used the truck primarily for their construction business. On the night of September 28, 2001, Kerry was involved in a single-vehicle accident during which "something broke in the front end, the truck flipped over, spun around the road, and slammed into a guardrail." As a result of this accident, the truck, which had logged approximately 30,000 miles, underwent repairs from October 1, 2001 to March 27, 2002. According to Bailey, his insurance company paid William Norton, an owner of the Norton and Richardson Body Shop, $20,309.38 to repair the vehicle.

After the repairs were completed, Bailey continued to drive the truck until he noticed an oil leak in the front axle. Because he needed a dependable truck for his business operation, Bailey made the decision to trade in the truck and purchase a new one from Stokes–Craven. In April 2002, Bailey contacted Kenny Craven and asked him to locate another truck. During this conversation, Bailey informed Kenny that his original truck had been "wrecked" and repaired by Norton and Richardson's Body Shop, a body shop for which Kenny knew had a good reputation. Bailey also told Kenny of the oil leak in the front axle.

On April 17, 2002, Bailey traded in his old truck for $28,714.50 and purchased a new truck from Stokes–Craven. At the time of the trade in, the truck had an odometer reading of approximately 57,000 miles.

On June 1, 2002, Austin and his girlfriend went to the Stokes–Craven dealership in search of a truck. After circling the dealership lot, Austin focused his attention on the truck

that had been traded in by Bailey. Because this truck appeared to meet Austin's desired specifications, he used his training as a mechanic to examine the outside and the underside. When he emerged from underneath the vehicle, Austin was met by William Frierson, a salesman for Stokes–Craven. Austin then asked Frierson a series of questions about the vehicle including the truck's warranty, whether the truck had been "wrecked," and information regarding the prior owner. According to Austin, Frierson informed him the warranty was a "5–year, 100,000 miles powertrain warranty." Austin also claimed Frierson denied that the truck had been "wrecked." In terms of the prior owner, Frierson indicated it was someone who operated a construction company in Summerville. When Austin inquired whether this previous owner was Bud Knight, someone whom Austin knew had the reputation of taking "immaculate" care of his vehicles, Frierson apparently responded "Yeah, I believe that is his truck." Austin was never shown the title to the truck.

Ultimately, Austin agreed to purchase the truck for $26,371.10. During the process of signing the purchase agreement, Austin questioned one of the forms indicating that he was buying the truck "as is." According to Austin, Frierson indicated this was a formality and that the truck had a "5–year, 100,000 mile powertrain warranty." Austin also claimed the finance manager confirmed the existence of the warranty and "talked [him] out of" purchasing an extended warranty.

Although the truck operated without incident initially, Austin discovered an oil leak in August 2002. Upon discovering the leak, Austin contacted another Ford dealership located near his residence in Moncks Corner to see if the rear-seal leak could be repaired under warranty. This dealership informed Austin that the repair was not covered by the truck's warranty and that he should contact Stokes–Craven regarding the repair.

According to Austin, he spoke with "Jim," an assistant service manager at Stokes–Craven, who told him that the repair was under warranty. When Austin inquired further about the warranty, Jim told him that he would check on it and call him with an answer. Subsequently, Jim informed Austin that the repair was not covered by the warranty and

advised him to contact Dennis Craven, one of the owners of Stokes–Craven.

The next day, Austin called Dennis and explained the problem. Because he was unfamiliar with the specifics of Austin's purchase, Dennis spoke with his staff and called Austin several days later. According to Austin, Dennis told him that his staff denied they had represented that the truck was covered under a five-year, 100,000 mile power train warranty. Dennis, however, offered to fix the leak with the stipulation that any additional repairs would have to be paid by Austin. Hearing this response, Austin asked to return the truck for the purchase price and rejected Dennis's offer to "trade [him] out of the truck." When Dennis denied his request, Austin indicated that he was not satisfied with this offer but still intended to have the oil leak fixed by Stokes–Craven. Following this conversation, Austin scheduled the repair for September 13, 2002.

Prior to his scheduled appointment, Austin discovered a warranty book in the truck which indicated that the truck was only covered by a five-year, 100,000 mile warranty limited to the engine. Austin also discovered that the truck had been registered to Gary Bailey and had sustained extensive damage prior to his purchase. Austin inadvertently discovered the "wreck" damage when he came in contact with William Norton, the owner of the repair shop where Bailey had taken the vehicle following his son's accident. During this discussion, Norton gave Austin the list of repairs made to the truck.

On September 13, 2002, Austin brought his truck to Stokes–Craven for the scheduled repair. After he dropped off his truck, Austin met with Dennis Craven and Barry Thornall, a used car manager at Stokes–Craven. Austin again requested that he be allowed to return the truck for the purchase price given his new discoveries regarding the prior ownership, the "wreck" damage, and the lack of a power train warranty. During the course of the conversation, Austin found out that Thornall, a neighbor of Bailey's, most likely was aware of the truck's history. Several minutes later, Dennis produced a "Buyer's Guide" document purportedly containing Austin's signature which stated that the truck was covered by a warranty "up to 100,000 on diesel engine." Austin denied that

he had signed the document and informed Dennis and Thornall that he had not received this document at the time of purchase.

Austin returned to Stokes–Craven approximately a week later to retrieve his truck which had been repaired. Austin then met with Dennis Craven to discuss the situation with his truck. During this meeting, Austin again denied he had signed the warranty document and requested the return of the purchase price in exchange for the truck. In response, Dennis compared the signed document with Austin's driver's license and then denied Austin's request.

On March 15, 2004, Austin filed suit against Stokes–Craven alleging the following causes of action: revocation of acceptance, breach of contract, negligence, constructive fraud, common law fraud, violation of the South Carolina Motor Vehicle Dealer's Act (the "Dealer's Act"), violation of the South Carolina Unfair Trade Practices Act (UTPA), and violation of the Federal Odometer Act.[2] Based on these claims, Austin sought actual damages, punitive damages, prejudgment interest, and attorney's fees and costs. Stokes–Craven answered and denied each of Austin's allegations.

At the conclusion of a three-day trial, the jury found in favor of Austin and awarded damages on the following causes of action: (1) negligence with an award of $26,371.10 actual damages and $144,000 punitive damages; (2) fraud with an award of $26,371.10 actual damages and $216,600 punitive damages; (3) constructive fraud with an award of $26,371.10 actual damages; and (4) a violation of the Dealer's Act with an award of $26,371.10 actual damages. The jury also found Stokes–Craven had violated the Federal Odometer Act. Additionally, the jury found in favor of Stokes–Craven regarding Austin's claim under the UTPA.[3]

Subsequently, both parties filed timely post-trial motions. Specifically, Stokes–Craven moved for judgment notwithstand-

---

**2.** The Federal Odometer Act, specifically titled "Motor Vehicle Information and Cost Savings Act," is codified at 49 U.S.C.A. § 32701 to § 32711 (West 2009).

**3.** During the trial, Austin withdrew his causes of action for revocation of acceptance and breach of contract.

ing the verdict (JNOV), a new trial, and a new trial *nisi remittitur*. Stokes–Craven filed a detailed memorandum in support of these motions. By order dated August 30, 2006, the trial judge denied each of Stokes–Craven's motions with the exception of the challenge to the jury's award of punitive damages. In a separate order, the trial judge affirmed the award of punitive damages finding evidence to support each of the requisite factors outlined in *Gamble v. Stevenson*, 305 S.C. 104, 406 S.E.2d 350 (1991).

Austin filed post-trial motions in which he sought the following relief: (1) an award of damages under the Federal Odometer Act given the jury found a violation but was not instructed to award damages under this cause of action; (2) an award of attorney's fees and costs under the Dealer's Act and the Federal Odometer Act; and (3) an award of prejudgment interest. Additionally, Austin challenged the trial judge's decision requiring him to elect between the jury's award of damages under his claims for fraud, negligence, and the violation of the Dealer's Act.

By order dated September 14, 2006, the trial judge granted in part and denied in part Austin's post-trial requests. In this order, the trial judge ruled that: (1) Austin was required to elect between his remedies; (2) the jury's finding that Stokes–Craven violated the Federal Odometer Act entitled Austin to a statutorily-authorized award of $1,500 plus attorney's fees and costs limited to those incurred in presenting the claim under the Federal Odometer Act; (3) Austin was entitled to recover $4,500 in attorney's fees, as opposed to the requested $49,936.50, based on the violation of the Federal Odometer Act; (4) Austin was entitled to taxable costs in the amount of $602.26; and (5) Austin was not entitled to prejudgment interest.

Both parties appeal from the trial judge's orders. Pursuant to Rule 204(b), SCACR, this Court certified this case from the Court of Appeals.

## STANDARD OF REVIEW

In an action at law, on appeal of a case tried by a jury, this Court may only correct errors of law. *Townes Assocs., Ltd. v. City of Greenville*, 266 S.C. 81, 85, 221 S.E.2d

773, 775 (1976). The factual findings of the jury will not be disturbed unless no evidence reasonably supports the jury's findings. *Id.*

## DISCUSSION

### I. Stokes–Craven's Appeal

#### A. Expert Witnesses

Stokes–Craven argues the trial judge erred in qualifying John Disher and Ray Morris as expert witnesses.

Reversal of a trial judge's qualification of an expert witness requires the complaining party to prove both an abuse of discretion and prejudice. *See Jenkins v. E.L. Long Motor Lines, Inc.,* 233 S.C. 87, 94, 103 S.E.2d 523, 527 (1958) (recognizing that the trial judge's ruling on the qualification of an expert would not be disturbed in the absence of an abuse of discretion); *Ellis v. Davidson,* 358 S.C. 509, 526, 595 S.E.2d 817, 826 (Ct.App.2004) (demonstrating that there must be both error on the part of the trial judge, as well as prejudice to the complaining party to warrant reversal). An abuse of discretion occurs when the decision of the trial judge is unsupported by the evidence or controlled by an error of law. *Ledford v. Pa. Life Ins. Co.,* 267 S.C. 671, 675, 230 S.E.2d 900, 902 (1976). In order to demonstrate prejudice, there must be a "reasonable probability the jury's verdict was influenced by the challenged evidence or the lack thereof." *Fields v. Reg'l Med. Ctr. Orangeburg,* 363 S.C. 19, 26, 609 S.E.2d 506, 509 (2005).

"All expert testimony must satisfy the Rule 702 criteria, and that includes the trial court's gatekeeping function in ensuring the proposed expert testimony meets a reliability threshold for the jury's ultimate consideration." *State v. White,* 382 S.C. 265, 270, 676 S.E.2d 684, 686 (2009). Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by

knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. Rule 702, SCRE.

"The test for qualification of an expert is a relative one that is dependent on the particular witness's reference to the subject." *Wilson v. Rivers*, 357 S.C. 447, 452, 593 S.E.2d 603, 605 (2004). To be competent to testify as an expert, a witness must have acquired by reason of study or experience or both such knowledge and skill in a profession or science that he or she is better qualified than the jury to form an opinion on the particular subject of his or her testimony. *Gooding v. St. Francis Xavier Hosp.*, 326 S.C. 248, 252–53, 487 S.E.2d 596, 598 (1997); *see State v. Goode*, 305 S.C. 176, 178, 406 S.E.2d 391, 393 (Ct.App.1991) ("There is no abuse of discretion as long as the witness has acquired by study or practical experience such knowledge of the subject matter of his testimony as would enable him to give guidance and assistance to the jury in resolving a factual issue which is beyond the scope of the jury's good judgment and common knowledge.").

Austin presented Disher, the owner and general manager of an auto body shop, as an expert in the field of auto body repair. Disher, who had thirty-five years' experience in autobody repair, testified Austin's counsel hired him to inspect Austin's truck. After his inspection, Disher confirmed that the truck had been in an accident and had sustained "extensive mechanical and body repairs" to correct the damage. Due to the condition of the vehicle, Disher opined that "in the right circumstances that could very definitely be a safety issue." When Disher explained his safety concerns, Stokes–Craven's counsel requested the trial judge "clarify" the scope of Disher's qualifications. The trial judge asked Austin's counsel to rephrase his question and limited Disher's testimony to any safety issues that resulted from "body collision repair" or "body repair." Disher then testified that the "only big issue that I would have would be the frame alignment issue and the wheel alignment." Disher believed that "anybody that had their eyes open and was looking ... could tell that there'd been a massive amount of repairs done to the vehicle." Counsel for Stokes–Craven objected to Disher's testimony regarding the ease with which someone could have

assessed the damage on the ground such testimony constituted speculation. The trial judge sustained the objection and counsel then began his cross-examination of Disher.

On appeal, Stokes–Craven contends Disher was not qualified to: (1) give an opinion as to any potential safety issues that may have been created by the prior accident, and (2) testify as to how "anyone" could tell the vehicle had been repaired.

Initially, we find Stokes–Craven failed to preserve any challenge to the admissibility of Disher's testimony. First, when Austin moved to qualify Disher as an expert witness in the field of auto body repair, counsel for Stokes–Craven did not question Disher and made no objection to his qualifications. Secondly, the trial judge sustained the objection interposed by counsel during Disher's testimony. Accordingly, we hold this argument was not properly preserved for appellate review. See Cogdill v. Watson, 289 S.C. 531, 537, 347 S.E.2d 126, 130 (Ct.App.1986) ("The failure to make an objection at the time evidence is offered constitutes a waiver of the right to object."); see also State v. Sinclair, 275 S.C. 608, 610, 274 S.E.2d 411, 412 (1981) (recognizing that when a trial judge sustains an objection there is no issue for the appellate court to decide given the objecting party received the relief he sought).

Even if properly preserved, we find Stokes–Craven cannot establish that it was prejudiced by the admission of Disher's testimony. First, the testimony was innocuous given it was extremely limited in duration and general in nature. Secondly, Stokes–Craven extensively cross-examined Disher regarding his qualifications and the fact that only someone with significant training or experience in the auto body repair industry would have discovered the extent of the repairs to the truck. Through cross-examination, Stokes–Craven's counsel also established Disher could not say "with a reasonable degree of certainty" that the prior damage would create a safety issue.

As his second expert witness, Austin sought to introduce Ray Morris as an expert in the automotive industry who would testify to the appraisal and valuation process regarding Austin's truck. In terms of his training, Morris testified that he

began in the automotive industry in 1973 when he was hired at a Honda motorcycle dealership. After a year, Morris became employed as a salesman at another automotive dealership. Subsequently, Morris then worked at Champion Spark Plug Company for six years during which time he worked directly with automobile dealerships. After Champion's sales dropped, Morris was forced to change jobs. At that point, Morris became employed with Rick Hendrick Honda where he worked as a salesperson as well as a finance and insurance manager. After he left Rick Hendrick Honda, Morris remained in the automotive industry in different capacities, primarily in sales of accessories, within Isuzu motors. For the next ten years, Morris worked at his family's business which was not within the automotive industry. When Morris and his wife retired to Charleston, Morris resumed his automotive interests through employment with the Rick Hendrick Jeep/Chrysler dealership. Due to health reasons, Morris left this position for a year. In 2000, Morris established a consulting business in which he "provid[ed] assistance with buying cars and understanding the process."

Following his cross-examination, Stokes–Craven's counsel objected to Morris being qualified as an expert. Over the objection of counsel, the trial judge found Morris qualified to testify regarding the value of Austin's truck.

In terms of assessing the value of Austin's truck, Morris testified that he inspected the truck and identified parts on the truck that had evidently been damaged and repaired. He characterized the damage as "extensive." Following his inspection, Morris discussed his assessment with Disher. Based on these data points, Morris ultimately testified to a reasonable degree of certainty that Austin's truck had a "zero retail value" on June 1, 2002, the day that Austin purchased the vehicle. Morris explained that this value was based on the damage that had been done to the vehicle plus potential safety issues that were created by this damage.[4]

---

4. Morris testified that he initially assigned a $14,000 value to the truck. However, he clarified that this value was based on incomplete information. After he received information from Disher regarding the truck's potential "safety issues," he concluded the retail value of the truck was "zero."

After this testimony, Austin sought to question Morris regarding his opinion as to whether a used car manager could have easily seen the "wreck" damage. The trial judge sustained Stokes–Craven's counsel's objection to this testimony.

When questioned on cross-examination as to how he determined the retail value of Austin's truck, Morris testified that Austin, as the retail buyer, would not have purchased the vehicle had he known it had been "wrecked." Based on this assessment, Morris stated that the vehicle "was worth nothing" to Austin. Although Morris acknowledged the truck had a salvage value, he discounted this value as to Austin given he would not have purchased a damaged vehicle.

■ On appeal, Stokes–Craven contends Morris was not qualified to testify as to the "concept of retail value" and his testimony did "nothing" to assist the jury. Thus, Stokes–Craven claims the trial judge abused his discretion in qualifying Morris and that this error warrants a new trial.

We find the trial judge did not abuse his discretion in qualifying Morris as an expert witness. As his direct examination testimony revealed, Morris had extensive experience in several sectors of the automotive industry which included the appraisal of vehicles. Notably, Morris had also been qualified as an expert witness on four or five other occasions. Thus, any defects in Morris's experience regarding the valuation of automobiles went to the weight and not the admissibility of his testimony. *See Peterson v. Nat'l R.R. Passenger Corp.*, 365 S.C. 391, 399, 618 S.E.2d 903, 907 (2005) ("Defects in an expert witness' education and experience go to the weight, not the admissibility, of the expert's testimony.").

■ However, even if the trial judge erred in qualifying Morris as an expert witness, we find Stokes–Craven was not prejudiced by the admission of his testimony. As previously stated, Stokes–Craven thoroughly cross-examined Morris regarding his lack of experience and qualifications. Furthermore, it appears that the testimony that Stokes–Craven primarily challenges on appeal was that produced by its own cross-examination of Morris. Finally, the testimony provided by Morris regarding the retail value was cumulative to other testimony. Specifically, Austin testified he believed the truck was "worth nothing" given he would not have bought it had he

known that it had been "wrecked." Additionally, Disher testified regarding the extensive damage to the vehicle and the potential safety issues created by this damage.

### B. Fair Market Value

Stokes–Craven asserts the trial judge erred in failing to grant its motions for a directed verdict, JNOV, or new trial given Austin offered no evidence as to the fair market value of the actual condition of the truck. Stokes–Craven contends Austin's testimony that the truck was not worth anything to him and Morris's testimony that the truck had a "zero retail value" was insufficient to satisfy Austin's burden of proving his entitlement to actual damages.

When we review a trial judge's grant or denial of a motion for directed verdict or JNOV, we reverse only when there is no evidence to support the ruling or when the ruling is governed by an error of law. *Creech v. South Carolina Wildlife & Marine Res. Dep't*, 328 S.C. 24, 29, 491 S.E.2d 571, 573 (1997).

As a preliminary matter, Austin contends this issue was not preserved for appellate review for several reasons, including the fact that Stokes–Craven never used the term "fair market value" during its presentation of its directed verdict motion or JNOV motion. Admittedly, Stokes–Craven only used the term "fair market value" on one occasion during Austin's testimony. However, we believe the lack of reference to this term is not fatal to Stokes–Craven's appellate argument. Given Stokes–Craven's counsel moved for a directed verdict and filed a detailed memorandum on its post-trial motions, we find this argument was sufficiently preserved for this Court's review. *I'On, L.L.C. v. Town of Mount Pleasant*, 338 S.C. 406, 422, 526 S.E.2d 716, 724 (2000) (acknowledging that an issue raised to and ruled upon by the lower court is preserved for appellate review). Having concluded this issue is properly before this Court, we now address the merits.

This Court has stated:

A plaintiff induced to enter a contract by fraud must elect between two remedies: he can elect to affirm the contract and bring an action to recover damages sustained by reason of the fraud or, alternatively, he may elect to rescind the

contract and recover the consideration paid plus incidental damages which were foreseeable and were incurred in reliance on the fraudulent misrepresentation.

*Fields v. Yarborough Ford, Inc.,* 307 S.C. 207, 211, 414 S.E.2d 164, 166 (1992).

 "The measure of damages for the sale of a defective vehicle is the difference in fair market value between the car, having been wrecked, and the value of the car had it not been wrecked at time of sale." *Barton v. Superior Motors, Inc.,* 309 S.C. 491, 494, 424 S.E.2d 524, 526 (Ct.App.1992); *see Mazloom v. Mazloom,* 382 S.C. 307, 321, 675 S.E.2d 746, 753 (Ct.App.2009) (recognizing the following definitions of "fair market value": (1) "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's length transaction"; (2) "the price which a willing buyer will pay a willing seller, neither being under compulsion to buy or sell").

 "Generally, in order for damages to be recoverable, the evidence should be such as to enable the court or jury to determine the amount thereof with reasonable certainty or accuracy." *Whisenant v. James Island Corp.,* 277 S.C. 10, 13, 281 S.E.2d 794, 796 (1981). "While neither the existence, causation nor amount of damages can be left to conjecture, guess or speculation, proof with mathematical certainty of the amount of loss or damage is not required." *Id.*

 "Ordinarily a property owner, who is familiar with his property and its value, may give his estimate of its value or the damage inflicted upon it even though he is not an expert." *Barton,* 309 S.C. at 494, 424 S.E.2d at 526; *Whisenant,* 277 S.C. at 13, 281 S.E.2d at 796 (noting that ordinarily a property owner, who is familiar with his property and its value, may give his estimate of its value or the damage inflicted upon it even though he is not an expert); *Abercrombie v. Abercrombie,* 372 S.C. 643, 647, 643 S.E.2d 697, 699 (Ct.App.2007) (recognizing general rule in South Carolina that a property owner is competent to offer testimony as to the value of his property); *Hawkins v. Greenwood Dev. Corp.,* 328 S.C. 585, 598, 493 S.E.2d 875, 881 (Ct.App.1997) ("The rule that a property owner is competent to present an opinion as to the property's value is well recognized."). "Unless the property

owner's lack of knowledge of the value of his property is so complete so as to render it worthless, it is for a jury to assess the probative value of his testimony." *Barton,* 309 S.C. at 494, 424 S.E.2d at 526.

Turning to the merits of this issue, we find there is evidence to support the jury's award of actual damages in the amount of $26,371.10, the purchase price of the vehicle retained by Austin.

Initially, we note the unique facts of the instant case. Normally, a property owner who seeks damages for a defective vehicle rescinds the contract, *i.e.,* returns the vehicle, and files suit to recover damages. *See Sparrow v. Toyota of Florence, Inc.,* 302 S.C. 418, 421–22, 396 S.E.2d 645, 647 (Ct.App.1990) ("In an action for fraud in the sale of goods, the plaintiff may elect to return the goods and recover the consideration paid or retain the goods and sue for damages. If he retains the goods, the measure of actual damages is the difference between the value the purchaser would have received if the facts were as represented and the value the purchaser actually received.").

Here, Austin repeatedly offered to return the truck to Stokes–Craven in exchange for the purchase price. Given Stokes–Craven adamantly declined Austin's offers, we do not believe Austin should be penalized or limited in his ability to recover damages due to the fact that he has retained the vehicle. Thus, the question becomes whether Austin offered sufficient proof to establish the fair market value of the truck to support the jury's award of actual damages in the amount of $26,371.10.

Austin, who was indisputably familiar with the truck, testified that the value of the vehicle was worth "nothing" on the date of sale given he would not have bought it had he known that it had been "wrecked." Morris similarly testified that the vehicle had a "zero retail value" on June 1, 2002, the date of sale. In light of this testimony, it is evident the jury accepted Austin's and Morris's valuations and assessed the fair market value of the truck when it awarded Austin actual damages in the amount of $26,371.10, the differential of the purchase price less the "zero" retail value. *See South Carolina State Highway Dep't v. Grant,* 265 S.C. 28, 32, 216 S.E.2d 758, 759–60

(1975) ("The basis for allowing a landowner to testify as to the value of his property is that he should not be deprived of his property without an opportunity of expressing his own view to the jury ... The jury is the tribunal to determine the weight to be accorded to the testimony of the witnesses and accept or reject the valuations placed thereupon."); *Dixon v. Besco Eng'g, Inc.*, 320 S.C. 174, 181, 463 S.E.2d 636, 640 (Ct.App. 1995) (affirming trial judge's award of actual damages for fair market value of plaintiff's lost tools where plaintiff testified to the amount it would cost to replace them and the amount awarded was comparable to the testimony). Based on the foregoing, we find the amount of actual damages awarded by the jury was supported by the testimony.

Because Austin offered sufficient evidence to support the award of actual damages through his own testimony and expert witness testimony, we find the cases cited by Stokes–Craven to be distinguishable in that in those cases the plaintiff failed to offer specific evidence as to the value of the vehicle.

### C. Federal Odometer Act

 Stokes–Craven contends the trial judge erred in failing to grant its motion for a directed verdict or JNOV as to Austin's claim under the Federal Odometer Act. Initially, Stokes–Craven asserts there was no "technical" violation of the Federal Odometer Act because: (1) the truck was not titled in Stokes–Craven's name, and (2) the odometer disclosure was properly made on a document used to reassign the truck's title to Austin. Even if its failure to disclose the odometer reading to Austin constituted a violation of the Act, Stokes–Craven claims this violation was not sufficient to support a recoverable claim given there was no specific "intent to defraud" Austin with respect to the truck's mileage.

As a preliminary matter, we question whether Stokes–Craven's first argument was properly preserved for this Court's review. At trial, Stokes–Craven's counsel appears to admit that the truck was titled in Stokes–Craven's name at the time Austin purchased the vehicle. Secondly, Frierson, the Stokes–Craven salesman involved in Austin's purchase, admitted that he had never shown a title to a customer in his twenty-five years of experience. Thus, any argument regarding the lack of title in Stokes–Craven's name or its failure to

disclose the title to Austin would not be preserved for appellate review. *See TNS Mills, Inc. v. South Carolina Dep't of Revenue,* 331 S.C. 611, 617, 503 S.E.2d 471, 474 (1998) ("An issue conceded in a lower court may not be argued on appeal.").

▮▮▮▮ However, even if Stokes–Craven's failure to disclose the truck title to Austin constituted a violation of the Act,[5] we find Austin did not prove Stokes–Craven violated the Act with the requisite intent to defraud.

▮▮▮▮ The Federal Odometer Act ("the Act") provides for a private cause of action where a defendant violates the Act with intent to defraud. 49 U.S.C.A. § 32710.[6] Thus, the question becomes whether Austin proved Stokes–Craven violated the Act with the requisite intent to defraud.

To satisfy this burden, Stokes–Craven claims Austin was required to establish that it violated the Act with a specific intent to defraud regarding the truck's mileage. In contrast, Austin construes the Act broadly and believes that a general intent to defraud is sufficient to satisfy this element in a civil action. In order to answer this question, we believe a review of the legislative history of the Act is instructive.

The purpose of this Act has been explained as follows:

In passing the Odometer Act, and its predecessor, Congress sought "(1) to prohibit tampering with motor vehicle

---

5. It would appear that Stokes–Craven technically violated the Act by failing to disclose the truck's title to Austin prior to his purchase. *See Tuckish v. Pompano Motor Co.,* 337 F.Supp.2d 1313, 1318 (S.D.Fla. 2004) ("Failure to provide a purchaser with a copy of the certificate of title, when such title is available, technically violates the Odometer Act."). However, because the purpose of the Act is to inform a car buyer of a vehicle's actual odometer reading prior to purchase, we believe this purpose could be effectuated by a seller disclosing the mileage on *any* document that is part of the purchase transaction. Thus, we do not interpret the Act as restricting the mileage disclosure solely to the title of the vehicle.

6. We note the statute provides for concurrent jurisdiction, stating "A person may bring a civil action to enforce a claim under this section in an appropriate United States district court or in another court of competent jurisdiction." 49 U.S.C.A. § 32710(b). The Act also does not preempt state law regarding the same subject matter. 49 U.S.C.A. § 32711.

odometers; and (2) to provide safeguards to protect purchasers in the sale of motor vehicles with altered or reset odometers." 49 U.S.C. § 32701(b). To accomplish these express goals, the Act imposes various requirements on persons transferring motor vehicles. In addition to flat prohibitions on tampering with odometers, a transferor "of a motor vehicle [must] give the transferee a written disclosure (A) of the cumulative mileage registered by the odometer; or (B) that the mileage is unknown if the transferor knows that the mileage registered by the odometer is incorrect." 49 U.S.C. § 32705(a)(1). Transferors are prohibited from making false statements in these disclosures. *See* 49 U.S.C. § 32705(a)(2). Furthermore, Congress provided for criminal and civil penalties for violations of the Act, including a private civil action. *See* 49 U.S.C. §§ 32709–32710. Section 32710 states: "A person that violates this chapter or a regulation prescribed or order issued under this chapter, *with intent to defraud,* is liable for 3 times the actual damages or $1,500, whichever is greater." 49 U.S.C. § 32710(a).

Based on a Congressional delegation of authority in § 32705, the National Highway Traffic Safety Administration ("NHTSA") promulgated regulations which "provide the way in which information is disclosed and retained under" the Act. 49 U.S.C. § 32705. The scope of these regulations is limited to "rules requiring transferors ... of motor vehicles to make written disclosure to transferees ... concerning the odometer mileage and its accuracy as directed by [the Act]." 49 C.F.R. § 580.1. Further, the purpose of the regulations "is to provide purchasers of motor vehicles with odometer information to assist them in determining a vehicle's condition and value by making the disclosure of a vehicle's mileage a condition of title...." 49 C.F.R. § 580.2. Accordingly, "each title, at the time it is issued to the transferee, must contain the mileage disclosed by the transferor when ownership of the vehicle was transferred...." 49 C.F.R. § 580.5(a). Additionally, transferors are required to disclose the mileage to the transferee in writing on the title. *See* 49 C.F.R. § 580.5(c).

*Nabors v. Auto Sports Unlimited, Inc.,* 475 F.Supp.2d 646, 649–50 (E.D.Mich.2007).

With respect to the question of whether the "intent to defraud" requirement for a civil action involves a specific intent to defraud as to mileage of the vehicle or a general intent to defraud, "[t]here is a split of authority on this issue, with the vast majority of courts concluding that the intent to defraud for the purposes of the Odometer Act is a specific intent to defraud as to mileage." *Nabors*, 475 F.Supp.2d at 650; *see Ioffe v. Skokie Motor Sales, Inc.*, 414 F.3d 708, 711 (7th Cir.2005) (analyzing the Federal Odometer Act and concluding "[s]ection 32710 does not create a private right of action for all violations of the Act and regulations that are accompanied by any 'intent to defraud.' Rather, where a plaintiff alleges a violation of 49 C.F.R. § 580.5(c), he must prove intent to defraud as to a vehicle mileage."); *see generally* Ann K. Wooster, Annotation, *Validity, Construction, and Application of Odometer Requirement Provisions of Motor Vehicle Information and Cost Savings Act (49 U.S.C.A. §§ 32701 to 32711)*, 198 A.L.R. Fed. 255 (2004 & Supp.2009) (analyzing cases involving the Federal Odometer Act and discussing requisite elements including the "intent to defraud").

Applying the foregoing to the facts of the instant case, we hold the trial judge erred in failing to grant Stokes–Craven's motion for a directed verdict or post-trial motion for JNOV. At trial, Austin's counsel conceded the claim under the Act did not arise out of a dispute regarding the mileage. Significantly, Austin never asserted that Stokes–Craven misrepresented the mileage of the truck or tampered with its odometer. Instead, Austin's claim under the Act was essentially based on Stokes–Craven's failure to disclose the title to the truck prior to Austin's purchase. Throughout the trial, Austin maintained that he would not have purchased the truck had he seen the title listing Bailey, not Bud Knight, as the previous owner. Had he been aware that Bailey was the previous owner, Austin claimed he would have been able to discover the extensive "wreck" damage.

In view of this evidence and Austin's arguments, we find his claim under the Act failed as a matter of law because he did not establish that Stokes–Craven's violation of the Act was coupled with a specific intent to defraud him regarding the truck's mileage. Thus, we find the trial judge should have

granted Stokes–Craven's motions for a directed verdict or JNOV with respect to this cause of action. *See Bodine v. Graco, Inc.,* 533 F.3d 1145 (9th Cir.2008) (holding purchaser of used vehicle failed to state a claim under the Act when she alleged that the vehicle's sellers violated the Act by deliberately withholding the vehicle's title to conceal that the vehicle had been severely damaged in an earlier collision given the absence of the requisite allegation that the sellers intended to defraud her as to the vehicle's mileage); *Nabors,* 475 F.Supp.2d at 653–54 (finding used automobile dealer was entitled to summary judgment on purchaser's claim under the Act where purchaser failed to present evidence indicating the dealer intended to defraud purchaser as to the vehicle's mileage even though there was evidence that purchaser may not have been notified that the vehicle was "salvaged" or that dealer may have used fabricated documents for the purposes of the lawsuit); *Ioffe,* 414 F.3d at 713–14 (recognizing that the Odometer Act "is concerned specifically with fraud related to the vehicle's mileage rather than with all types of fraud that might involve the withholding of a vehicle's title"). Accordingly, we reverse the trial judge's award of $1,500 in actual damages and $4,500 in attorney's fees to Austin under this cause of action.

## D. Inconsistent Verdicts

Stokes–Craven asserts the trial judge erred in failing to grant it a new trial on the ground the jury verdicts were inconsistent. Given the jury found in favor of Austin as to his claims for fraud and in favor of Stokes–Craven as to the UTPA claim, Stokes–Craven contends these verdicts are irreconcilable and, thus, warrant a new trial.

Whether to grant a new trial is a matter within the discretion of the trial judge, and this decision will not be disturbed on appeal unless it is unsupported by the evidence or is controlled by an error of law. *Vinson v. Hartley,* 324 S.C. 389, 403, 477 S.E.2d 715, 722 (Ct.App.1996). Verdicts which are irreconcilably inconsistent should not stand, and a new trial should be granted, because the parties and the judge "should not be required to guess as to what a jury sought to render." *Prego v. Hobart,* 287 S.C. 116, 118, 336 S.E.2d 725, 726 (Ct.App.1985). However, "[i]t is the duty of the court to

sustain verdicts when a logical reason for reconciling them can be found." *Rhodes v. Winn–Dixie Greenville, Inc.*, 249 S.C. 526, 530, 155 S.E.2d 308, 310 (1967).

■■■ "To recover in an action under the UTPA, the plaintiff must show: (1) the defendant engaged in an unfair or deceptive act in the conduct of trade or commerce; (2) the unfair or deceptive act affected public interest; and (3) the plaintiff suffered monetary or property loss as a result of the defendant's unfair or deceptive act(s)." *Wright v. Craft*, 372 S.C. 1, 23, 640 S.E.2d 486, 498 (Ct.App.2006); S.C.Code Ann. §§ 39–5–10 to –560 (1976 & Supp.2009).

■■■ In contrast, "[t]o establish a cause of action for fraud, the following elements must be proven by clear, cogent, and convincing evidence: (1) a representation of fact; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury." *Schnellmann v. Roettger*, 373 S.C. 379, 382, 645 S.E.2d 239, 241 (2007). "The failure to prove any element of fraud or misrepresentation is fatal to the claim." *Id.*

A review of the elements of these two claims reveals that different proof is required to recover under each cause of action. For example, the jury could have found the elements of fraud were sufficient to satisfy the deceptive act prong of an UTPA claim; however, it may have concluded the deceptive act was confined to Austin's transaction and did not affect the public interest, *i.e.,* satisfy the public interest prong of the UTPA claim. Thus, we find the verdicts of the jury were not necessarily inconsistent.

## E. Punitive Damages

Stokes–Craven asserts the judge erred in affirming the jury's award of $216,600 in punitive damages. In support of this assertion, it contends the award: (1) cannot stand because the award of actual damages was improper; (2) was based upon the improper closing arguments of Austin's counsel; and (3) is excessive and unconstitutional.

Having found there was evidence to support the jury's award of actual damages to Austin in the amount of $26,371.10, we focus our analysis on Stokes–Craven's two remaining arguments regarding the award of punitive damages.

In the instant case, Stokes–Craven challenged the award of punitive damages during trial and in its post-trial motions. Prior to the jury's deliberations, a sealed statement regarding Stokes–Craven's net worth was submitted to the jury with the instruction that they only open it in the event punitive damages were awarded. In the course of his closing argument, Austin's counsel indicated that he had not seen this net worth statement and, thus, could only rely on the testimony at trial to estimate the profits of Stokes–Craven. Specifically, counsel referenced the testimony of Dennis Craven wherein he testified regarding the average number of vehicles sold per year and the average profit per vehicle. Extrapolating from this testimony, Austin's counsel stated "[t]he total profit for 2005, based on Mr. Craven's testimony is one million three hundred and sixty-five thousand dollars profit." Throughout this portion of Austin's counsel's closing argument, counsel for Stokes–Craven interposed objections which were partially sustained by the trial judge.

In its post-trial motion, Stokes–Craven challenged the award of punitive damages on several grounds which included the alleged improper closing remarks of Austin's counsel and the excessiveness of the award.

In his order affirming the jury's award of punitive damages, the trial judge specifically identified and found evidence in the record to support each of the factors outlined in *Gamble*.

Turning to Stokes–Craven's remaining two arguments, we find any complaint regarding improper closing arguments is inconsequential given both the jury and the trial judge relied upon the sealed statement of Stokes–Craven's net worth in assessing whether Stokes–Craven had the ability to pay.[7] This statement reflected that Stokes–Craven's net

---

7. Although we do not think it was prejudicial to Stokes–Craven, we note the trial judge in his written order referenced Dennis Craven's testimony to conclusively establish the dealership's net profit as $1,365,000.

worth was $1,444,561 as of December 31, 2005. Accordingly, Stokes–Craven's second argument is without merit.

■ We now turn to Stokes–Craven's final argument in which it challenges the amount of the award of punitive damages.

■ "Because punitive damages are quasi-criminal in nature, the process of assessing punitive damages is subject to the protections of the Due Process Clause of the Fourteenth Amendment of the United States Constitution." *James v. Horace Mann Ins. Co.*, 371 S.C. 187, 194, 638 S.E.2d 667, 670 (2006).

Recently, this Court articulated the guideposts to be applied in conducting a post-judgment review of punitive damages awards. *Mitchell v. Fortis Ins. Co.*, 385 S.C. 570, 686 S.E.2d 176 (2009).[8] In *Mitchell*, we explained that a trial judge shall review the constitutionality of a punitive damages award by determining whether the award was reasonable under the following guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual and potential harm suffered by the plaintiff and the amount of the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Id.* at 587–88, 686 S.E.2d at 185–86 (citing *BMW of North America v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)). We further emphasized that an appellate court reviews de novo the trial judge's application of these guideposts. *Id.*

Based on our review of the record in the context of the *Mitchell* test, we find the amount of punitive damages awarded to Austin was not grossly excessive. In reaching this conclusion, we address each of the factors enunciated in *Mitchell*.

---

The only reference in the record to this figure is in Austin's counsel's closing argument.

**8.** Because *Mitchell* was decided after the trial in the instant case, we note the trial judge did not have the benefit of our opinion. The judge did, however, properly apply the eight-factor post-verdict review standard of *Gamble v. Stevenson*, 305 S.C. 104, 406 S.E.2d 350 (1991), which was in effect at the time of the trial.

 In terms of reprehensibility, we should consider whether: (1) the harm caused was physical as opposed to economic; (2) the tortious conduct evinced an indifference to or a reckless disregard for the health or safety of others; (3) the target of the conduct had financial vulnerability; (4) the conduct involved repeated actions or was an isolated incident; and (5) the harm was the result of intentional malice, trickery, or deceit, rather than mere accident. *Id.* at 587, 686 S.E.2d at 185 (citing *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)).

Considering the above-outlined factors, we find Stokes–Craven's conduct can only be construed as exhibiting an extremely high degree of reprehensibility. Admittedly, the harm caused to Austin was economic. However, this factor alone does not minimize the reprehensibility of Stokes–Craven's conduct given the dealership procured Austin's purchase of the truck through its employees' affirmative misrepresentations regarding the condition of the vehicle. Significantly, Stokes–Craven employees failed to disclose that the truck had been "wrecked" and the lack of a power train warranty. There is also evidence that Stokes–Craven forged Austin's signature on the "Buyer's Guide" in an effort to legitimize the lack of a power train warranty. We believe these misrepresentations, particularly as to whether the vehicle had been wrecked, evinced an indifference to or a reckless disregard of the health and safety of Austin and the general public that would share the road with the potentially unsafe vehicle. Finally, there is evidence that Stokes–Craven's mistreatment of Austin, a financially vulnerable customer, was not an isolated incident as Frierson testified that he had not shown a title to a customer in his twenty-five years of experience.

 Next, we find the ratio of punitive damages to actual damages does not warrant reversal. In determining the reasonableness of the ratio we may consider: the likelihood that that the award will deter the defendant from like conduct; whether the award is reasonably related to the harm likely to result from such conduct; and the defendant's ability to pay. *Id.* at 588, 686 S.E.2d at 185.

Admittedly, an 8.21 ratio is high considering the type of "injury" underlying Austin's claims. However, it is a single-

digit ratio and there is evidence of Stokes–Craven's ability to pay. Furthermore, given the extent of the wreck damage and the resultant safety issues, we believe there was a potential for Austin or his passengers to be subjected to serious injury. We also find the amount of the award of punitive damages will inevitably serve as a deterrent to Stokes–Craven from engaging in future misconduct. *See Gore*, 517 U.S. at 582, 116 S.Ct. 1589 (stating "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages"); *Mitchell*, 385 S.C. at 594, 686 S.E.2d at 188 (concluding a 9.2 to 1 ratio satisfied due process and comported with South Carolina law); *Atkinson v. Orkin Exterminating Co.*, 361 S.C. 156, 170, 604 S.E.2d 385, 392–93 (2004) (stating " 'few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process' " (quoting *Campbell*, 538 U.S. at 425, 123 S.Ct. 1513)); *cf. James*, 371 S.C. at 196, 638 S.E.2d at 672 (concluding, in a case involving an insured's bad faith claim against his insurer, punitive damage award of $1,000,00 which was 6.82 times the amount of actual damages was reasonably related to the actual harm suffered).

Finally, we must consider the difference between the punitive damages awarded to Austin and the civil penalties authorized or imposed in comparable cases. Because the jury awarded punitive damages pursuant to Austin's fraud cause of action, we are compelled to review factually-similar cases.[9] Based on our review of these cases, we conclude the award of punitive damages in the instant case is consistent with those of comparable cases. *See, e.g., Krysa v. Payne*, 176 S.W.3d 150 (Mo.Ct.App.2005) (affirming jury verdict of $18,449.53 in compensatory damages and $500,000 in punitive damages awarded to purchasers of a used vehicle against dealership where dealership: did not provide title to purchasers at the time of purchase; failed to disclose that the vehicle had thirteen prior owners; affirmatively misrepresented the condition of the

---

9. We disagree with the dissent's analysis of this prong of the *Mitchell* test. We find the dissent's reliance on the Motor Vehicle Dealers Act is misplaced given this Act does not provide for civil penalties and, thus, is inapposite.

vehicle; and failed to disclose that the vehicle had sustained significant wreck damage); *Parrott v. Carr Chevrolet, Inc.,* 331 Or. 537, 17 P.3d 473 (2001) (affirming award of $11,496 in compensatory damages and $1 million in punitive damages where the defendant car dealership sold the plaintiff a vehicle that had been previously involved in a serious accident and was missing several pieces of emission control equipment).

In conclusion, having carefully considered the *Mitchell* guideposts, we hold the jury's award of punitive damages was not grossly excessive in violation of the Due Process Clause of the Fourteenth Amendment.

## I. Austin's Appeal

### A. Election of Remedies

Austin essentially contends the trial judge erred in failing to award his request for attorney's fees and costs in its entirety for the amount of $49,936.50.

In his post-trial motion, Austin requested to recover damages under all of the jury's verdicts in addition to attorney's fees and costs as statutorily-authorized under the Dealer's Act and the Federal Odometer Act. In his order addressing this request, the trial judge held Austin was required to elect one verdict as between the negligence, fraud, constructive fraud, and the Dealer's Act given Austin experienced one loss based on four different theories.

In view of this holding, the trial judge implicitly denied Austin's request for attorney's fees and costs under the Dealer's Act. Given Austin's recovery under the Federal Odometer Act represented a separate cause of action, the trial judge awarded Austin $1,500 in actual damages and a "reasonable attorney fee" in the amount of $4,500, which represented the time spent on recovering under the Federal Odometer Act.[10]

Because Austin was ordered to elect between the jury's verdicts of negligence, constructive fraud, fraud, and the violation of the Dealer's Act, Austin claims he was denied the

10. As previously discussed, we find the trial judge erred in failing to direct a verdict in favor of Stokes–Craven as to Austin's claim under the Federal Odometer Act. Thus, we must necessarily reverse Austin's recovery of attorney's fees under the Federal Odometer Act.

statutorily-authorized attorney's fees and costs under the Dealer's Act [11] given he chose to recover for his fraud claim which yielded only actual and punitive damages.

"Election of remedies involves a choice between different forms of redress afforded by law for the same injury or different forms of proceeding on the same cause of action." *Taylor v. Medenica,* 324 S.C. 200, 218, 479 S.E.2d 35, 44 (1996). The basic purpose of election of remedies is to prevent double recovery for a single wrong. *Save Charleston Found. v. Murray,* 286 S.C. 170, 333 S.E.2d 60 (Ct.App.1985). "When an identical set of facts entitle the plaintiff to alternative remedies, he may plead and prove his entitlement to either or both; however, the plaintiff may not recover both." *Id.* at 175, 333 S.E.2d at 64.

Although novel in this state, we find Austin's contention is supported by case law from other jurisdictions. As we interpret these cases, they stand for the proposition that a plaintiff may recover attorney fees under a statutory claim in addition to punitive damages under a common law claim. The rationale for this position is that an award for both does not amount to double recovery for a single wrong given attorney's fees are intended to make such claims economically viable for private citizens whereas an award of punitive damages is designed to punish wrongful conduct and deter future misconduct. *See, e.g., Miller v. United Automax,* 166 S.W.3d 692, 697–98 (Tenn.2005) (holding, in suit involving buyers of a used car, election of remedies doctrine did not bar buyers from recovering attorney fees under the Tennessee Consumer Protection Act after having elected to receive punitive damages on their common law misrepresentation claim in lieu of statutory treble damages); *Wilkins v. Peninsula Motor Cars, Inc.,* 266 Va. 558, 587 S.E.2d 581, 583–84 (2003) (concluding, in a case

---

11. The applicable provision of the South Carolina Dealer's Act provides:

In addition to temporary or permanent injunctive relief as provided in § 56–15–40(3)(c), any person who shall be injured in his business or property by reason of anything forbidden in this chapter may sue therefor in the court of common pleas and shall recover double the actual damages by him sustained, and the cost of suit, *including a reasonable attorney's fee.*

S.C.Code Ann. § 56–15–110(1) (2006) (emphasis added).

involving a buyer of used car, election of remedies doctrine did not require the buyer to elect between verdicts of fraud and violation of the Virginia Consumer Protection Act where recovery of attorney fees under the Act was not duplicative of punitive damages awarded on the common law fraud claim).

Because costly attorney fees may deter private citizens from bringing a claim under the Dealer's Act, a decision in favor of Austin facilitates the purpose of the Act which is to provide buyers a private right of action against dealers who engage in deceptive practices. Furthermore, given the recovery of attorney's fees under the Dealer's Act is not duplicative of the award of punitive damages, we do not believe a decision in favor of Austin would violate the election of remedies doctrine's prevention of double redress for a single wrong. As its name states, the doctrine applies to the election of "remedies" not the election of "verdicts." Thus, an award of attorney's fees and costs would merely serve to fully compensate Austin for pursuing his statutorily-authorized private right of action under the Dealer's Act, which we believe epitomizes the definition of a remedy. *See Black's Law Dictionary* 1163 (5th ed. 1979) (defining "remedy" as "[t]he means by which a right is enforced or the violation of a right is prevented, redressed, or compensated").

Given our conclusion that Austin can recover attorney's fees and costs under the Dealer's Act, the question becomes whether he should be awarded the entire amount of his request or should the amount be limited to the fees incurred in establishing his claim under the Dealer's Act.

Under the specific facts of this case, we find it would be difficult to dissect Austin's counsel's fee affidavit to ascertain how much time was spent on this particular claim given the violation of the Act was based on the same facts and circumstances underlying his claims for fraud and constructive fraud. Furthermore, to award Austin his claim in its entirety would be consistent with the precedent of this Court. *Cf. Taylor v. Nix,* 307 S.C. 551, 557, 416 S.E.2d 619, 622 (1992) (finding award of attorney fees under the Dealer's Act was warranted even though fee affidavit was not itemized for time spent for claim under the Act and that spent for the nonstatutory cause of action).

## B. Prejudgment Interest

 Austin contends the trial judge erred in declining to award him prejudgment interest. Because Stokes–Craven rejected Austin's "demand" to return the truck in exchange for the purchase price, Austin claims his actual damages were "capable of ascertainment." In support of these assertions, Austin notes the jury awarded actual damages in the amount of $26,371.10 which equaled the purchase price of $25,981.10 plus $390.00 for the taxes and tags.

 "The law permits the award of prejudgment interest when a monetary obligation is a sum certain, or is capable of being reduced to certainty, accruing from the time payment may be demanded either by the agreement of the parties or the operation of law." *Historic Charleston Holdings, LLC v. Mallon, LLC,* 381 S.C. 417, 435, 673 S.E.2d 448, 457 (2009); *see* S.C.Code Ann. § 34-31-20(A) (Supp.2009) ("In all cases of accounts stated and in all cases wherein any sum or sums of money shall be ascertained and, being due, shall draw interest according to law, the legal interest shall be at the rate of eight and three-fourths percent per annum."). "Generally, prejudgment interest may not be recovered on an unliquidated claim in the absence of agreement or statute." *Charleston Holdings, LLC,* 381 S.C. at 435, 673 S.E.2d at 457. "The fact that the amount due is disputed does not render the claim unliquidated for purposes of awarding prejudgment interest." *Id.* "Rather, the proper test is 'whether [or not] the measure of recovery, not necessarily the amount of damages, is fixed by conditions existing at the time the claim arose.' " *Id.* (quoting *Butler Contracting, Inc. v. Court Street, LLC,* 369 S.C. 121, 133, 631 S.E.2d 252, 259 (2006)).

Although Austin is correct that prejudgment interest is statutorily authorized by the provisions of section 34-31-20 of the South Carolina Code, we find Austin's damages were not liquidated at the time his claim arose. Austin's lawsuit arose out of his dissatisfaction with the purchase of a used vehicle. Because Austin alleged claims of fraud, constructive fraud, negligence, and violations of state and federal motor vehicle acts his prospective damages were unliquidated and could not have been ascertained without evidence of the retail value of the truck. Given Austin's monetary recovery could not have

been reduced to certainty, the trial judge correctly denied Austin's request for prejudgment interest.

## CONCLUSION

As to Stokes–Craven's appeal, we hold: (1) there was no prejudicial abuse of discretion in admitting the testimony of Disher and Morris; (2) Austin offered proof of actual damages in the amount of $26,371.10; (3) Austin failed to prove that Stokes–Craven violated the Federal Odometer Act with the requisite intent to defraud him as to the mileage of the truck; (4) the verdicts for fraud and violation of the UTPA were not inconsistent; and (5) there was evidence to support the jury's award of $216,000 in punitive damages.

In terms of Austin's cross-appeal, we hold: (1) he is entitled to the entire amount of his request for attorney's fees and costs under the South Carolina Dealer's Act; and (2) he is not entitled to prejudgment interest.

Accordingly, we remand this case to the circuit court for entry of judgment consistent with our decision.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

WALLER, J., concurs.

PLEICONES, J., concurring in part and dissenting in part in a separate opinion.

KITTREDGE, J., concurring in part, dissenting in part in a separate opinion in which TOAL, C.J., concurs.

Justice PLEICONES, concurring in part and dissenting in part.

I respectfully concur in part and dissent in part. Specifically, I agree that Stokes–Craven has not shown an abuse of discretion in the trial court's decision to qualify Morris as an expert, *State v. White*, 382 S.C. 265, 676 S.E.2d 684 (2009), although I would give no weight to the fact that Morris had been qualified as an expert on several other occasions. *Cf. State v. Jones*, 383 S.C. 535, 681 S.E.2d 580 (2009) (despite fact that other jurisdictions had permitted same witness to

testify as expert in area, trial court abused its discretion in admitting the evidence). I also agree with the majority that Stokes–Craven was entitled to a directed verdict on the Federal Odometer Act claim, and that it cannot prevail on its new trial argument. *See Camden v. Hilton,* 360 S.C. 164, 600 S.E.2d 88 (Ct.App.2005) (inconsistent verdict allegation waived if not raised before jury is dismissed). Finally, I agree with the majority that the trial judge properly denied Austin's request for prejudgment interest.

I agree with Austin that the issue whether Stokes–Craven was entitled to a directed verdict because Austin offered no evidence of fair market value is not preserved for appeal as this failure of proof was not raised as a ground for a directed verdict. Consequently, whether it was raised in the judgment *non obstante veredicto* (JNOV) motion and/or is discussed in the detailed post-trial memorandum is irrelevant. *E.g., In re McCracken,* 346 S.C. 87, 551 S.E.2d 235 (2001) (only issues raised at directed verdict can properly be raised a JNOV). Moreover, since there was no contemporaneous objection either to the expert's or to the owner's testimony that the truck had a value of $0, I agree that there was evidence of value for the jury's consideration. *E.g., Cantrell v. Carruth,* 250 S.C. 415, 158 S.E.2d 208 (1967) (evidence received without objection becomes competent and cannot be disregarded when considering directed verdict motion). Had the issue been properly preserved, however, I would agree that Austin failed to present any competent evidence of the truck's fair market value, which clearly is more than $0.

Stokes–Craven also contends that it was entitled to a new trial as there is no evidence in the record to support the jury's verdict valuing the truck at $26,371.10, that is, the amount Austin paid for it. Since there was no objection to Austin's or Morris' $0 value testimony, there is evidence in the record to support this verdict.[12] I therefore agree with the majority that Stokes–Craven has not shown an abuse of discretion in

---

12. I do not agree, however, with the suggestion that Stokes–Craven's refusal to allow Austin's request to return the truck for a full refund permits Austin to seek rescission damages in a breach of contract suit. In my view, Stokes–Craven was under no obligation to honor Austin's request.

the trial court's denial of a new trial. *E.g., Dillon v. Frazer,* 383 S.C. 59, 678 S.E.2d 251 (2009).

On appeal, Stokes–Craven contends the trial judge erred in allowing Disher to testify to safety issues. In my view, this issue is not preserved for appellate review since the judge sustained both of Stokes–Craven's objections to Disher's answers which exceeded the scope of Disher's expertise. *See State v. Thompson,* 304 S.C. 85, 403 S.E.2d 139 (Ct.App.1991) (where objection sustained and no further relief is sought, no issue is preserved for appeal as appellant received all relief requested from trial judge). As I do not view the issue as preserved, I do not join the majority's discussion of prejudice.

Unlike the majority, I would reduce the punitive damages award here. Stokes–Craven challenges the punitive damages award on three grounds arguing that:

1) since the actual damage award of $26,371.10 must be reversed, the punitive damage award cannot stand;

2) the punitive award is based on an inappropriate closing argument; and

3) the award is unconstitutionally excessive.

As explained above, no issue relating to the actual damage award is preserved for appellate review, and thus Stokes–Craven's first argument fails.

The question of improper closing argument is also not preserved. Austin's counsel argued that, extrapolating from other testimony, Stokes–Craven's **total profit** for 2005 was $1,365,000. Stokes–Craven did not object to this argument. In its order reviewing punitive damages, the trial judge wrote that the witness had testified to this "total profit," which is incorrect. However, Stokes–Craven never called this misstatement to the trial judge's attention. Given that there was no objection to the extrapolation of total profit in Austin's closing argument, its alleged impropriety cannot be the basis for reversal here. *E.g., Ligon v. Norris,* 371 S.C. 625, 640 S.E.2d 467 (Ct.App.2006). Further, the trial court's unobjected-to misstatement in its order reversing punitive damages is not a basis for reversal. *E.g., State v. Covert,* 382 S.C. 205, 675 S.E.2d 740 (2009) (error must cause sufficient prejudice to warrant reversal).

The third ground urged for reversal is Stokes–Craven's argument that the punitive damages verdict of $216,600 is unconstitutionally excessive. In *Mitchell v. Fortis Ins. Co.,* 385 S.C. 570, 686 S.E.2d 176 (2009), we articulated a reformulated three-part test to be used in conducting a post-judgment review of a punitive damages award: the reprehensibility of the defendant's conduct; the ratio between the actual or potential harm suffered by the plaintiff and the amount of the punitive damages award; and the difference between the punitive damages verdict and civil penalties authorized in comparable cases. I have reviewed each part below.

## 1. Reprehensibility

 In my view, it is reprehensible to misrepresent a warranty, and to deny that the vehicle had been wrecked when asked directly. I do not find it reprehensible, however, to vaguely confirm the buyer's guess as to the identity of the truck's prior owner. I find the warranty issue was mitigated since, when the misrepresentation/misunderstanding was discovered about two months after the purchase, Stokes–Craven's offered to "trade [Austin] out of the truck." As to the vague confirmation by Stokes–Craven as to the truck's prior owner, i.e., "Yeah, I believe that is his truck," I do not find the action particularly despicable. I am, however, deeply troubled by Stokes–Craven's misrepresentation that the truck had not been wrecked. My concern is tempered somewhat by the testimony of Austin's own expert Disher that "anybody that [sic] had their eyes open and was looking ... could tell that there'd been a massive amount of repairs done to that vehicle" in light of Austin's testimony that he "used his training as a mechanic to examine the [truck's] outside and its underside." The misrepresentation is reprehensible: whether Austin was misled is questionable.

In short, I find the conduct mildly reprehensible. Unlike the majority, I find no evidence that Stokes–Craven "forged" Austin's signature on the "Buyers Guide," only evidence that Austin denied signing it. Finally, given that we have held the trial judge should have granted a directed verdict on the Federal Odometer Act claim, I do not agree that we should rely on evidence of Stokes–Craven's practice of not showing titles to customers, evidence admitted only in an attempt to

prove the Odometer Act claim, as probative of reprehensibility.

## 2. Ratio

Although I find that Stokes–Craven did not preserve its objections to the testimony that the fair market value of the truck was $0, in viewing this ratio guidepost *Fortis* instructs we need not always compare the punitive award to the actual damages.

Here, the truck obviously had residual value, either as scrap or for its intended purpose in light of the evidence that Austin continued to drive the truck at the time of the trial, more than four years after it was purchased. In my view, the actual damage award far exceeds the true value of any harm or potential harm suffered by Austin.

On a pure ratio basis, the relationship between the actual/punitive awards is 1:8.21. In my view, this ratio is, as the majority acknowledges, "high," especially since I view the actual damages award as unreliable. Looking at the ratio in light of the other factors to be considered under *Fortis*, I find the punitive damages awarded here will deter Stokes–Craven from making misrepresentations in the future; that the $216,000 awarded is reasonably related to the harm likely to result from such conduct; and that Stokes–Craven has the ability to pay. I therefore reluctantly conclude that ratio does not provide a basis to reverse or reduce the punitive damage award.

The final guidepost under *Fortis* is a comparison of the $216,000 to civil penalties authorized in comparable cases. In my view, the closest comparable statutory scheme is the Motor Vehicles Dealers Act, which admittedly does not provide for civil penalties. While the jury found a violation of that statute here, it found no punitive damages were warranted. Under this Act, punitive damages can be awarded if the defendant acted "maliciously," but any such award is capped at three times the actual damages awarded. S.C.Code Ann. § 56–15–110(3) (2006). Here, the maximum "statutory penalty" would have been $79,113.30 in light of the actual damages award of $26,371.10.

In short, the reprehensibility is mild, the ratio is high, and the comparable penalty less. Viewing these three guideposts,

I find the verdict here constitutionally excessive, and would remit the punitive award to $100,000. *Compare Fortis, supra* (partially remitting punitive damages award after appellate review).

■■■ I agree with the majority that a plaintiff who elects to receive damages awarded under a common law theory may also be entitled to recover statutory costs and attorneys fees to which he is entitled under a separate verdict, without running afoul of the public policies underlying the doctrine of election of remedies. *See, e.g., United Labs., Inc. v. Kuyken-dall,* 335 N.C. 183, 437 S.E.2d 374 (1993). As explained below, however, I do not believe this issue is preserved for our consideration.

Here, Austin sought attorneys' fees under the Dealers Act and also sought reasonable attorneys' fees under the Odometer Act. The trial judge awarded him attorneys' fees under the Odometer Act, restricting the amount to fees and costs reasonably and necessarily incurred in prosecuting that cause of action. The majority has concluded that Austin's Odometer Act claim must fail. In my view, his claim for attorneys' fees and costs dies with it.

On appeal, Austin maintains the trial court erred in requiring him to elect between punitive damages under the fraud or negligence verdict and his costs and fees under the Dealers Act. In my view, this issue is not preserved. After the court ruled that Austin must elect between the Dealers Act verdict, the fraud verdict, and the negligence verdict, but did not rule on this issue involving an election between punitive damages and statutory fees, Austin filed no motion to alter or amend. Since this issue was not ruled on below and no motion to alter or amend was made, no issue regarding the availability of Dealers Act fees and costs is preserved for our review. *E.g., Metts v. Mims,* 384 S.C. 491, 682 S.E.2d 813 (2009).

I also disagree with the majority's holding that, pursuant to *Taylor v. Nix,* 307 S.C. 551, 416 S.E.2d 619 (1992), a plaintiff entitled to fees under the Dealers Act need not segregate the amount of attorney time and costs attributable to that claim and recover only these sums. That opinion holds:

The defendant's attorney argued fees related to the [non-Dealers Act] cause of action should have been excluded.

We agree. However, precisely what fees were unrelated to the statutory action were not presented to the lower court ... [T]he party asserting the right to attorneys fees [must] produce an itemized affidavit of their fees that they believe are related to the statutory claim. The opposing party then has the burden of showing which of the fees are clearly unrelated.

*Taylor v. Nix,* 307 S.C. at 557, 416 S.E.2d at 622.

The only attorneys' fees affidavit in this record was submitted by Austin's counsel prior to the court's ruling on the election of remedies issues, and makes no pretense of separating fees incurred only in pursuit of the Dealers Act or the Odometer Act. He therefore did not meet even the threshold requirement of *Taylor v. Nix, supra.*

Overlooking for the moment that the issue is not preserved, I disagree with the majority that we may award all fees and costs sought on this record, given the applicable law. This is especially so since in making the fees and costs award Austin sought under the Odometer Act, the trial judge honored *Taylor v. Nix:* he required Austin to submit a new affidavit identifying fees and costs attributable to that cause of action, and gave Stokes–Craven the opportunity for "input" following submission of that affidavit. Presumably, the trial judge would have followed this same procedure had he made an award under the Dealers Act.

Austin sought attorneys' fees and costs under two separate statutes. The judge awarded them under one, and Austin did not object. Nowhere below did Austin specify he sought to recover fees and costs incurred in prosecuting the Odometer Act claim in addition to fees and costs incurred in pursuing the Dealers Act claim.

I concur in part and dissent in part.

Justice KITTREDGE, concurring in part and dissenting in part.

I concur in part and dissent in part. I join the well-written majority opinion of Justice Beatty save two exceptions. Concerning the trial court's failure to grant a directed verdict due to the lack of evidence of fair market value and the election of remedies issue, I join the dissent of Justice Pleicones. Additionally, regarding the reprehensibility prong of the punitive

damages analysis, I believe Justice Pleicones is correct in rejecting any reliance on Stokes–Craven's practice of not showing titles to customers because the Federal Odometer Act claim fails as a matter of law. I nevertheless join the majority in affirming the punitive damages award. I believe there was ample evidence of Stokes–Craven's reprehensibility (which I do not view as "mild") beyond its failure to show titles to customers. I otherwise concur with the majority opinion's analysis regarding the punitive damages award.

TOAL, C.J., concurs.